**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RYAN BAGWELL** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:15-cv-00531 (CRC) |
| ) | |
| **UNITED STATES DEPARTMENT OF** ) | |
| **JUSTICE** ) | |
| ) | |
| Defendant. ) | |
| ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff Ryan Bagwell hereby opposes Defendant's Renewed Motion for Summary

Judgment (ECF No. 57) and cross-moves for summary judgment in this Freedom of Information

Act ("FOIA") dispute. For reasons more fully explained below, Defendant has failed to prove the

withheld records of this federal investigation are exempt from the FOIA's disclosure

requirements. Plaintiff asks that the court DENY Defendant's motion and GRANT Plaintiff's

motion.

## I.      FACTUAL BACKGROUND

### The Sandusky "scandal"

Following a years-long investigation, on November, 5, 2011, prosecutors with the

Pennsylvania Office of Attorney General ("OAG") charged Gerald Sandusky, a former football

coach at The Pennsylvania State University("PSU"), with multiple counts of child sexual abuse.

One of the allegations, perhaps the most notorious, involved an allegation by a PSU staff

member who claimed he witnessed Sandusky sodomizing a juvenile in a PSU locker room

shower in 2001 and reported the incident to then-Director of Athletics Timothy Curley and

then-Senior Vice President for Business and Finance Gary Schultz. Curley and Schultz were

charged with failing to report suspected child abuse at the same time Sandusky was charged.

The charges marked a period of crisis for PSU, a university with a reputation for both

academic and athletic excellence that was suddenly seen as an institution that prioritized athletic

success over the safety of children. National outrage over the allegations ensued and the public

began to pressure federal agencies to investigate the university. On November 8, 2011, a

Pennsylvania congressman called on the U.S. Department of Education (DOE) to determine if

any federal education laws were broken[1]. After four days of national outrage and mounting

pressure from the popular press, on November 9, 2011, PSU's Board of Trustees fired then-PSU

President Graham Spanier and former PSU Football Coach Joseph Paterno[2].

As early as November 11, 2011, the Office of the U.S. Attorney for the Middle District of

Pennsylvania (USAOMDPA) began to receive hundreds of email petitions from citizens

throughout the country asking it to "[i]nvestigate violations of federal law by Jerry Sandusky

---

[1] The education department announced it had initiated a program review of the university the next day.
[2] Paterno died after battling lung cancer on January 23, 2012.

(Exhibit A). As a result, on November 14, 2011, USAOMDPA released a public statement that said it was supporting and assisting with the DOE's investigation and offered to support the OAG with its activities (Exhibit B).

Notably, USAOMDPA did not state that it had begun its own inquiry at this time.

On November 22, 2011, Penn State hired former FBI Director Louis J. Freeh and his law firm, Freeh, Sporkin & Sullivan ("FSS") to conduct an internal investigation into the state criminal allegations and present his findings in the form of a public report[3].

On June 22, 2012, Sandusky was convicted of most of the charges against him and sentenced to at least 30 years in prison. Notably, he was found not guilty on the charge of sodomizing a juvenile in a PSU shower.

On July 12, 2012, Louis J. Freeh presented FSS's findings to the public at a live, televised press conference[4]. In his prepared remarks, Freeh stated, "our work was done in parallel with several other active investigations by agencies and governmental authorities, including the … United States Attorney ... We continuously interfaced and cooperated with those agencies" (Exhibit C). On or about November 11, 2012, OAG prosecutors announced additional charges against Curley and Schultz, and for the first time charged Spanier with related crimes.

The criminal prosecution of the PSU administrators continued for years. On January 23, 2016, a state appellate court dismissed most of the charges against the former PSU administrators, which paved the way for the few remaining charges to head to trial.

---

[3] http://abcnews.go.com/US/penn-state-hires-fbi-director-louis-freeh-investigate/story?id=14999351
[4] https://www.washingtonpost.com/sports/2012/07/12/gJQAfVoMfW_story.html

On March 13, 2017, just days before their trial was scheduled to begin, Curley and

Schultz each pleaded guilty to one count of endangering the welfare of a child. Spanier's case

continued to trial.

On March 24, 2017, after deliberating for two days, a jury found Spanier guilty of one

count of child endangerment; not guilty on a second count, and; not guilty of a related conspiracy

charge. On June 3, 2017, all three men were sentenced to a period of jail time and house arrest.

Spanier appealed his conviction to Pennsylvania Superior Court, an intermediate appellate body.

Curley and Schultz did not appeal. The have been serving their sentences since June 15, 2017

and are now reportedly confined to house arrest.

Following his conviction, Sandusky pursued and exhausted his direct appellate rights. In

June 2014, Sandusky initiated an indirect appeal pursuant to Pennsylvania's Post Conviction

Relief Act ("PCRA"), a process permitted by state statute that allows a convicted person to seek

a new trial based on issues of constitutional violations, ineffective counsel or the discovery of

new evidence.

On October 18, 2017, a state judge dismissed Sandusky's PCRA petition and declined to

order a new trial. As of the time of this filing, Sandusky has not appealed the judge's decision.

Despite the vigorous and multi-year prosecution of Sandusky and the former PSU

administrators by state authorities, no criminal charges were ever brought by USAOMDPA or

any other federal law enforcement agency.

**Plaintiff's FOIA Request**

On April 30, 2014, Plaintiff sent his FOIA request to Executive Office of United States

Attorneys ("EOUSA"), a subcomponent of Defendant, seeking "access to any and all records of

investigations between November 1, 2011 and [April 30, 2014] that pertain to allegations of child sexual abuse that occurred on the campus of The Pennsylvania State University". EOUSA denied the request. Plaintiff successfully appealed the denial administratively, and the request was remanded to EOUSA to process Plaintiff's FOIA request[5].

### Plaintiff's FOIA litigation

Despite the remand order, EOUSA failed to process the request. As a result, plaintiff filed the instant action on April 8, 2015. A few weeks after commencing the litigation, EOUSA released about 517 pages of records that consisted almost entirely of newspaper articles, a copy of the Freeh Report and half of an additional copy of the Freeh Report. It withheld 104 pages of records, and further stated it withholding an unknown number of pages of information described as "grand jury material which is retained in the District."

Both sides moved for summary judgment. On March 3, 2016, the Court found the 104 pages of records were properly withheld, but denied summary judgment with regard to all other records. It further ordered Defendant to file a <u>Vaughn</u> index and produce any releasable records within six months.

Having been ordered to produce any releasable material, Defendant then demanded thousands of dollars in fees from Plaintiff before it would complete its search. Plaintiff filed fee-waiver requests, which were denied. Plaintiff moved the Court to grant his fee-waiver request. Following a hearing with the Court, Defendant dropped its opposition to Plaintiff's fee-waiver request on October 13, 2016.

---

[5] Specifically, Defendant's Office of Information Policy ordered EOUSA to (1) reopen the matter; (2) search for records responsive to Plaintiff's request, and; (3) send any releasable records directly to Plaintiff.

The Court established another production schedule on October 27, 2016, ordering Defendant to release any non-exempt emails between Defendant and employees of FSS no later than November 30, 2016. It also ordered Defendant to complete production of responsive, non-exempt records in their entirety by May 1, 2017. *Id*.

On May 1, 2017, Defendant summarized its production efforts in a Joint Status Report as follows:

1. 120,000 pages were reviewed;

2. 90,000 pages were not responsive;

3. 329 "docs" were referred to various agencies that included:

    a. Federal Bureau of Investigation ("FBI");

    b. U.S. Office of Personnel Management ("OPM");

    c. Immigration and Customs Enforcement ("ICE");

    d. Department of Education ("DOE"), and;

    e. U.S. Postal Inspection Service ("USPIS").

4. 1,870 pages of records were released in full or in part, and;

5. 1,420 pages were withheld in full.

(ECF No. 42).

On May 30, 2017, OPM told Plaintiff it was withholding documents related to Spanier pursuant to (b)(6) and (b)(7)(C) (Exhibit D). On May 24, 2017, the FBI told Plaintiff it released 45 pages to Plaintiff in full or in part and withheld 15 in full (Exhibit E). On July 17, 2017, Plaintiff received a letter from USPIS that stated 7 pages of information were being released in full or in part, and 28 pages of information were being withheld in full. (Exhibit F). On July 24,

2017, ICE informed Plaintiff that EOUSA had referred 1 document to it for potential release, and that portions were redacted (Exhibit G). Plaintiff has not received any response from DOE.

## II.    ARGUMENT

Summary judgment is appropriate when there is no genuine issue as to the material facts, and the moving party demonstrates it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). FOIA lawsuits are typically resolved on cross-motions for summary judgment. *Reliant Energy Power Generation v. FERC*, 520 F. Supp. 2d 194, 200 (D.D.C. 2007). A court reviews agency handling of a FOIA request *de novo*. 5 U.S.C. § 552(a)(4)(B); *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984).

The government bears the burden to establish that its claimed exemptions apply to each document for which it invokes an exemption. *Am. Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 619, 393 U.S. App. D.C. 384 (D.C. Cir. 2011). The government cannot satisfy its burden with affidavits that are vague or conclusory, or merely parrot the statutory standard. *Consumer Fed'n of Am. v. U.S. Dep't of Agric.*, 455 F.3d 283, 287, 372 U.S. App. D.C. 198 (D.C. Cir. 2006). Evidentiary declarations must describe the justifications for withholding in "specific detail, demonstrate[ing] that the information withheld logically falls within the claimed exemption." *Am. Civil Liberties Union*, 628 F.3d at 619. "When demonstrating that a FOIA exemption applies to some portion of a document withheld, the agency must also provide a detailed justification for its non-segregability," *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776, 354 U.S. App. D.C. 49 (D.C. Cir. 2002), and the agency should "describe what portion of the information is non-exempt and how that material is dispersed throughout the

document," *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 261, 184 U.S. App. D.C. 350 (D.C. Cir. 1997).

### A.      Defendant has failed to establish the adequacy of its email search.

Agencies have the burden to demonstrate they made a "good faith effort to conduct a search … using methods which can be reasonably expected to produce the information requested." *DiBacco v. U.S. Army*, 795 F.3d 178 (D.C. Cir. 2015), citing *Oglesby v. Department of Army*, 920 F.2d 57, 61-62, 287 U.S.App.D.C. 126 (D.C. Cir. 1990). When search terms are used to locate electronic records, the agency must produce a "reasonably detailed" affidavit that describes the terms used and the type of search performed. *Id.*, citing *Valencia-Lucena v. United States Coast Guard*, 180 F.3d at 326 U.S.App.D.C. 386 (D.C. Cir. 1999). If the record raises "substantial doubt" about the adequacy of the agency's search, "particularly in view of well defined requests and positive indications of overlooked materials," summary judgment should be denied. *Id.* (internal quotation marks omitted).

The Second Declaration of D. Brian Simpson (Second Simpson Decl.) describes the search for e-mails conducted by the district office. The email accounts of six employees were searched using four terms: "Pennsylvania State University," "Child sexual abuse and Pennsylvania State University," "Sandusky," and "Freeh". Second Simpson Decl. ¶ 11, 12. This short list of search terms is inadequate for several reasons.

First, the terms terms would not be likely to uncover all e-mails concerning the investigations because much of Defendant's investigation appears to have been focused on the actions of people involved in The Second Mile ("TSM"), the charity founded by Sandusky, instead of on PSU or even Sandusky himself. Sandusky's official involvement with the charity

8

ended years before Defendant's investigation commenced, so it is unlikely that his name would appear in most emails. FSS did not examine the conduct of TSM, and it's unlikely that employees of FSS would have used any of the search terms in their e-mail communications with Defendant. Therefore, it is unlikely that "Freeh" would be present in most e-mails pertaining to this investigation. Finally, since PSU used outside counsel for much of its legal work related to this matter, Pennsylvania State University wouldn't likely be present in many of those emails.

The search terms are further inadequate because they presume that USAO employees always used the full, proper name of PSU ("Pennsylvania State University"), when the school is typically referred to simply as "Penn State" or abbreviated as PSU.

Third, they presume that every e-mail contained at least one of only four words or phrases, when it seems clear that many or even most email communications would not contain any of them.

Plaintiff outlined his concerns about using such a short list of terms in a letter to Defendant dated February 26, 2016 (Exhibit N). Therein, he suggested Defendant should review the investigation(s) that were the subject of the request and compile a list of terms that reflect the nature and circumstances of those investigations. A prudent search would have included such terms as the names of investigators, case numbers, victim/witness/target names and the names of witnesses' attorneys. Plaintiff even suggested 14 search terms based on his limited knowledge of Defendant's investigation that should have been used, but those suggestions were apparently ignored.

Finally, the fact that Defendant produced only two e-mails with employees of FSS demonstrates the shortcomings of Defendant's search. Louis Freeh stated publicly that his firm

"continuously interfaced and cooperated" with several federal agencies, one of which was the

United States Attorney. A firm that interacted continuously with a federal agency over the course

of 9 months would generate far more e-mail traffic than two communications. This is precisely

the type of "positive [indication] of overlooked materials" that should be grounds for denying

summary judgment. *Valencia-Lucena, supra.*

> **B.      Defendant has failed to prove that records referred to other agencies are exempt from the FOIA's disclosure requirements.**

Under the FOIA, Courts are authorized to order the release of "agency records."  5 U.S.C.

§ 552(a)(4)(B). Government information is an "agency record" if (1) the agency created or

obtained the material, and (2) it was in control of the subject material when the FOIA request

was made. *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 144-45 (1989). An agency

"controls" a record if the material has "come into the agency's possession in the legitimate

conduct of its official duties." *Id*. There is no dispute that Defendant obtained the referred

records in the ordinary course of official business. Therefore, the documents referred to other

agencies are "agency records" of Defendant.

Agencies cannot simply refer their records to other agencies as a matter of course but

must show that the procedure is reasonable under the circumstances. See *McGehee v. CIA*, 697

F.2d 1095, 1110 (D.C. Cir.1983). The agency has a duty to process a request for records, even

when they originate from another agency. The agency may only "acquit itself through a referral,

provided the referral does not lead to improper withholding under the McGehee test."  *Sussman*

*v. U.S. Marshals*, 494 F.3d 1106, 1118 (D.C. Cir. 2007).

When an agency acts under its referral process, the referral constitutes a "withholding" if

the "net effect" of the process "is significantly to impair the requester's ability to obtain the

records or significantly to increase the amount of time he must wait to obtain them." *McGehee*,

1095, 1110. A withholding on referral grounds is "improper" unless the agency can demonstrate

that the process "significantly improves the quality of the process whereby the government

determines whether all or portions of responsive documents are exempt from disclosure." *Id*. A

procedure that results in "very long delays" will be highly difficult to justify. *Id*.

Here, Defendant referred records to five other agencies for review and potential release

directly to Plaintiff. One agency, DOE, still hasn't responded. Since no response has been

received, records referred to DOE have been improperly withheld.

As for records of the FBI, OPM, USPIS and ICE, Defendant has failed to submit any

evidentiary support or argument to support the agencies' contentions that the referred

information was properly withheld.

**C.     Defendant has failed to prove that records received from the Pennsylvania Office of Attorney General may be withheld.**

Defendant is withholding approximately 243,000 pages of records received by OAG.

Simpson Decl. at 46. Defendant cites Exemption 7(A) as the sole reason for the withholding.

Exemption 7(A) of the FOIA protects "records or information compiled for law

enforcement purposes, but only to the extent that the production of such law enforcement records

or information could reasonably be expected to interfere with enforcement proceedings." 5

U.S.C. §552 (b)(7)(A). Its purpose is to "prevent disclosures which might prematurely reveal the

government's cases in court, its evidence and strategies, or the nature, scope, direction, and focus

of its investigations, and thereby enable suspects to establish defenses or fraudulent alibis or to

destroy or alter evidence." *Maydak v. United States Dep't of Justice*, 218 F.3d 760, 762 (D.C.

Cir. 2000).

For the government to successfully invoke Exemption 7(A), it must demonstrate the applicability of two elements. First, it must show that the identified law enforcement proceeding is pending or prospective. Second, it must demonstrate that the release of the information would reasonably be expected to cause some articulable harm. *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978).

Only a sufficient showing of genuine harm is enough to justify the withholding of records under Exemption 7(A). The types of harm that may sufficiently justify Exemption 7(A) include witness intimidation, revelation of the scope and target of the investigation, destruction of evidence, and construction of alibis. See *North v. Walsh*, 881 F.2d, 1098 U.S. App. D.C. 373 (D.C. Cir. 1989).

When the subject of an investigation already has access to the requested records, agencies may not rely on categorical assertions of harm as Defendant has done here. Instead, to prevail, the agency must demonstrate specifically how disclosure of the information at issue would interfere with an investigation. *Campbell v. Department of Health & Human Servs.*, 221 U.S. App. D.C. 1, 682 F.2d 256, 265 (D.C. Cir. 1982).

Importantly, records whose release would only harm a portion of a law enforcement proceeding must be released if the relevant portion of the proceeding has ended. *North v. Walsh*, 881 F.2d 1088, 1100, 279 U.S. App. D.C. 373 (D.C. Cir. 1989) ("Disclosure of the information … cannot interfere with parts of the enforcement proceeding already concluded.").

When invoking Exemption 7(A), an agency can satisfy its burden of proof "by grouping documents in categories and offering generic reasons for withholding the documents in each category." *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 746 F.3d 1082

(D.C. Cir. 2014) (quoting *Maydak v. U.S. Dep't of Justice*, 218 F.3d 760, 762 (D.C. Cir. 2000)).

However, when using the so-called "generic" approach, the agency must meet three conditions:

> First, it must define its categories functionally. Second, it must conduct a document-by-document review in order to assign documents to the proper category. Finally, it must explain to the court how the release of each category would interfere with enforcement proceedings.

*Bevis v. Dep't of State*, 801 F.2d 1386, 1389-90, 255 U.S.App. D.C. 347 (D.C. Cir. 1986).

### 1.      Defendant has failed to make the requisite demonstration of harm.

Defendant has failed meet any of the requirements mandated by the court in *Beavis*. It failed to review the records at all, choosing instead to allow them to remain on the District's file servers. It chose not to categorize the information. It did not conduct a document-by-document review. It provided absolutely no explanation about how the release of the documents would interfere with enforcement proceedings.

Since Defendant failed to conduct any meaningful review of the records from OAG and provide the Court with any meaningful description of their contents, it simply cannot meets its burden of proving release of the records would interfere or harm any of the ongoing, post-trial proceedings in Pennsylvania. Defendant's conclusory statement that "[r]elease of information withheld could reasonably be expected to interfere with those investigations, prosecutions, and post-conviction hearings," Def. Brief, p. 14, is precisely the type of inadequate evidentiary support that must be rejected by the Court.

Defendant further contends it "has described the category of records to allow the Court to assess functionally whether their release would risk interference with criminal investigations and/or post-convictions and/or new trials." Def. Brief, p. 14. This is fundamentally false.

Defendant's declarations and *Vaughn* index are devoid of any description of the withheld records, let alone one that would allow the Court to assess the potential for any interference if released.

In sum, Defendant has failed to offer any evidence whatsoever that the records from the OAG would harm either of the pending post-trial proceedings. The Court should grant summary judgment in Plaintiff's favor

> **D.    Records withheld in their entirety.**

Defendant has withheld a number of documents in their entirety. It cites three exemptions for withholding these records - Exemption 5, 6 and 7(C).

The FOIA's Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The exemption covers "those documents, and only those documents [that are] normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). Specifically, Defendant has invoked the attorney-work product privilege and the deliberative process privilege, which are among the privileges that may be used to withhold records pursuant to Exemption 5.

> **1.    Defendant has failed to prove the applicability of the attorney-work product privilege.**

The attorney work-product privilege protects "documents and tangible things that are prepared in anticipation of litigation." Fed. R. Civ. P. 26(b)(3)(A). To successfully invoke the work-product privilege, Defendant must demonstrate that the document was prepared *in anticipation of litigation*. To do this, it must satisfy this Circuit's so-called "because of" test, which holds that "whether, in light of the nature of the document and the factual situation in the

particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *United States v. Deloitte LLP*, 610 F.3d 129, 137, 391 U.S.App.D.C. 318 (D.C. Cir. 2010). For that test to be met, "the attorney who created the document must have 'had a subjective belief that litigation was a real possibility,' and that subjective belief must have been 'objectively reasonable.'" *National Association of Criminal Defense Lawyers v. United States Department of Justice*, No. 15-5051 (D.C. Cir. July 19, 2017).

When an agency invokes the work-product privilege on behalf of government attorneys working in a law enforcement context, as Defendant has in this matter, the agency must meet a higher evidentiary standard than if the attorney was acting merely as a legal advisor. To satisfy the requirement that the documents were prepared in anticipation of litigation, it must identify a "specific claim" in an enforcement action that caused the document's creation. For the enforcement action to be "sufficiently on the horizon to implicate the work-product privilege, the agency's investigation must have advanced to the point that the documents' authors contemplated bringing 'a specific claim supported by concrete facts.'" *Id*. "At an early stage … there is insufficient reason to anticipate litigation. But for documents created at a later stage in which the agency contemplates bringing a specific action, disclosure might reveal" information that is protected by the work-product privilege. *Id*. It is not enough for Defendant to simply identify an active investigation in which the attorneys were involved. Defendant must also prove an enforcement action was "foreseeably at hand" at the time the documents were prepared. *Id.*

When a specific claim is required to invoke the privilege, as it is in the case, the government must demonstrate that the investigation focused "upon specific events and a specific

possible violation by a specific party," at the time the documents were created. *In re Sealed Case,* 146 F.3d 881, 885 (D.C. Cir. 1998).

The reason for this higher standard is to ensure that a law-enforcement agency brimming with attorneys, such the office of a United States attorney, cannot shield all of its activities from public scrutiny forever. "While it may be true that the prospect of future litigation touches virtually any object of a [law-enforcement agency] attorney's attention, if the agency were allowed 'to withhold any document prepared by any person in the Government with a law degree simply because litigation might someday occur, the policies of the FOIA would be largely defeated.'" *Senate of the Com. of Puerto Rico*, 823 F.2d at 586-87 (quoting *Coastal States*, 617 F.2d at 865).

To successfully prove the application of the work-product privilege, courts in this district have required the government to demonstrate an actual nexus between the content and nature of the withheld documents and the role that only an attorney would play in their creation. For example, documents described as "third party information as well as thoughts and opinions of attorneys regarding the case" is not sufficient for the government to prove the work-product privilege applies. *Boyd v. Exec. Office For United States Attorneys*, 87 F.Supp.3d 58 (D.D.C. 2015). Similarly, a six-page record containing a "[s]eries of communication letters between attorneys handling the case" regarding "various third parties, items relating to the Grand Jury, and case strategy" was also found to be inadequate. *Id*. Conversely, documents described as "information related to trial preparation, trial strategy, interpretations, and personal evaluations and opinions pertinent to [the] plaintiff's criminal case" as well as "deliberations concerning asset forfeiture decisions [and] possible strategies as they relate to the case" have been found to

16

be exempt. *Petrucelli v. Department of Justice*, 51 F.Supp.3d 142 (D.D.C. 2014); "[a] letter prepared by an AUSA ... to his client [discussing] litigation filed by [the plaintiff] against the client and litigation that the AUSA was contemplating filing against [the plaintiff] to enjoin him from harassing the client in the future." *Concepcion v. Federal Bureau of Investigation*, 606 F.Supp.2d 14 (D.D.C. 2009), and; records that "reflect such matters as trial preparation, trial strategy, legal interpretations, and personal evaluations and opinions by Assistant United States Attorneys and the United States Attorney pertinent to grand jury investigation and subpoenas relating to a third party criminal case." *Toensing v. United States Department of Justice*, No. 11-1215 (D.D.C November 14, 2013).

In almost all instances, Defendant has failed to meet the "specific claim" test as described above. The Second Stone Declaration states that "USAO-MDPA was investigating claims of sexual child abuses[sic] campus, among other possible violations of the law that may have occurred on Penn State University's campus. If it was determined that laws were violated, USAO-MDPA could have filed civil or criminal charged [sic] against individuals." Second Stone Decl. ¶ 51. Here, Defendant's declarations fall short because they only state that child sexual abuse was being investigated generally, along with other unnamed "possible violations." The declarations fail to identify "specific events and a specific possible violation by a specific party" that are tied to the creation of each withheld document for which the work-product privilege is being invoked. Without such demonstration, the Court must grant summary judgment in Plaintiff's favor.

Additionally, the descriptions of the documents in Defendant's *Vaughn* index closely follow those that the D.C. Circuit has previously found to be inadequate. In *Coastal States Gas*

*Corp. vs. Department of Energy*, 617 F.2d 854 (D.C. Cir. 1980), the agency described one of the withheld documents as containing a "detailed discussion of facts and applicability of § 212.111(a) (2) to a specific case." *Id* at 866. It rejected that description as inadequate, writing "the agency must establish in its affidavits or indexes the fact that a specific claim had arisen, was disputed by the company, and was being discussed in the memorandum." Here, the descriptions contained in the government's *Vaughn* index look too similar to those in *Coastal States* to be considered adequate. For example, Item 1 is described as an "internal email … discussing draft memoranda that was prepared by the legal team. *Vaughn* index, p. 1. The memoranda contain the government attorney's legal theories and analysis of potential avenues to pursue." Item EMAIL_0003333 is described as "email discussions … regarding information garnered through witnesses' interviews." *Vaughn* index, p. 4. Item EMAIL_0008607 is described as "email discussions among government attorneys concerning draft responses to media inquiry about the PSU/Sandusky investigation." *Vaughn* index, p. 6. None of the descriptions assert the discussions focused on a specific claim that was being investigated or that was likely to result in litigation. As a result, Defendant's claims of exemption are inadequate.

### 2.    The deliberative process privilege

Exemption 5 also encompasses the deliberative process privilege, which allows Defendant to  "withhold 'all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be.'" *Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 4 (D.C. Cir. 2014) (quoting *Sears, Roebuck*, 421 U.S. at 153). It is "limited to documents that are 'predecisional' and 'deliberative,' meaning 'they reflect advisory opinions, recommendations, and deliberations comprising part of a process by which governmental

decisions and policies are formulated, [or] the personal opinions of the writer prior to the agency's adoption of a policy.'" *Id* (quoting *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 875, 389 U.S.App.D.C. 356 (D.C. Cir. 2010)).

To meet its burden of proving the predecisional and deliberative nature of the withheld documents, the government must "establish what deliberative process is involved, and the role played by the documents at issue in the course of that process." *Senate of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 585-86 (D.C. Cir. 1987) (quoting *Coastal States*, 617 F.2d at 868). It must further "describe the nature of the decision making authority vested in the office or person issuing the disputed document[s], and the positions in the chain of command of the parties to the documents." *Elec. Frontier Found. v. U.S. Dep't of Justice*, 826 F.Supp.2d 157, 168 (D.D.C. 2011) (quoting *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 258 (D.C. Cir. 1982)). Documents sent from subordinates to superiors are more likely to be deliberative in character than documents traveling in the opposite direction. *Senate of P.R., supra.*

"The need to describe each withheld document when Exemption 5 is at issue is particularly acute because the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process." *Animal Legal Def. Fund, Inc. v. Dep't of Air Force*, 44 F.Supp.2d 295, 299 (D.D.C. 1999) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980)).

Finally, once a document is "is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public," it can no longer be considered predecisional. *Coastal States*, 617 F.2d at 866.

Further, the deliberative process privilege "does not protect documents in their entirety; if the government can segregate and disclose non-privileged factual information within a document, it must." *Loving*, 550 F.3d at 38 (citing *Army Times Publ'g Co. v. U.S. Dep't of Air Force,* 998 F.2d 1067, 1071 (D.C. Cir. 1993)).

Here, Defendant has failed to demonstrate that the documents reflect opinions made as part of a process in which an agency decision was being made. Again and again, its *Vaughn* index simply parrots the relevant legal standards. For example, Defendant states it withheld EMAIL_0003268 to protect the "pre-decisional and deliberative, decision-making processes of the government attorneys." EMAIL_0003269 was withheld to "protect the pre-decisional and deliberative processes of the government attorneys." Similar language is found throughout the government's *Vaughn* index. Such descriptions fall short of providing the specific facts necessary for Defendant to meet its burden of proof.

### 3.    Exemption 6 and Exemption 7(C)

Throughout its Vaughn index, plaintiff cites Exemption 6 and Exemption 7(C) "to protect the names, telephone numbers and other personally identifiable information of government attorneys." However, instead of simply redacting the information that Defendant asserts is protected, it has decided to withhold documents in their entirety. Plaintiff cannot withhold documents in full to protect names, telephone numbers and other information that is personally identifiable. The Court should order Defendant to release all non-protected information.

### 4.    Specific withheld documents

20

Although Plaintiff has contested the sufficiency of Defendant's declarations and *Vaughn* index overall, the following items should not be withheld for the corresponding reasons (the referenced item numbers correspond to Plaintiff's annotated Vaughn index (Exhibit M).

### a.   Item 1.

Item 1 is described as an "[i]nternal email distributed among AUSA's assigned to the Penn State University/Sandusky investigation discussing draft memoranda that was prepared by the legal team. The memoranda contain the government attorneys' legal theories and analysis of potential avenues to pursue during the course of the investigation." *Vaughn* index, p. 1. Although Defendant claims these documents are protected by the work-product privilege, the description makes it clear that they were actually prepared during the early stages of the agency's investigation. Discussions of "potential avenues to pursue during the course of an investigation" only happen in the fact-gathering phase of an inquiry, which typically occurs before litigation is contemplated. "[L]egal theories and analysis" without litigation being contemplated are not protected by the work-product privilege.

Defendant further claims Item 2 is protected by the deliberative process privilege. Nowhere does it identify the process that it seeks to protect, nor does it say how the documents would reveal anything about a process.

### b.   Item 2

Defendant describes these items as "Draft Memorandum – Witness Interviews and Witness List." *Vaughn* index, p. 2. Defendant asserts the memo "summarizes and analyzes information obtained from witness interviews" which could have "lead to litigation if it was

determined that laws were violated." Defendant's own statement makes clear that no litigation was contemplated at the time the memo was written.

Defendant also claims the memo is deliberative. However, it has failed to explain how summaries of information from witness interviews are would reveal and back-and-forth process in which a policy or decision was expected to be made.

### c.   Item 3.

These items are described as "[e]mail discussions … regarding information garnered through witnesses' interviews." Defendant contends the information could have served "as the foundation for contemplated litigation if it was determined that laws were violated" *Vaughn* index, p. 4. These items do not deserve work-product protection because, as Defendant indicates, it had yet to decide whether to bring an enforcement action at the time the documents were created. Additionally, the deliberative process privilege does not apply because Defendant has not explained what decision or policy was expected to be reached by the alleged "discussions."

### d.   Item 6.

Item 6 consists of approximately 118 documents described as "[e]mail distributed to AUSAs … discussing the legal effect that the results of Sandusky's hearings and subsequent conviction may have on the investigation." This description demonstrates that the discussions pertained to the investigatory stage of the government's inquiry, not a stage during which any sort of legal action was prospective or foreseeable. The government attorneys implicated in these documents were acting in their capacity as investigators, not attorneys, and as a result, the work-product privilege does not apply.

Furthermore, the government's assertion of the deliberative process privilege also falls short. There is no description of the deliberative process that it seeks to protect, nor does it say how the documents would reveal anything about that process.

### f.      Item 11

Item 11 consists of "preservation letters", "proffer letters" and  a letter to the Pennsylvania Attorney General, which Defendant states is "possibly releasable" but being "withheld in full because it is an unsigned draft letter." *Vaughn* index, p. 16. Again, the government invoked the the attorney-work product and deliberative process privileges in its withholdings.

Defendant has failed to meet its burden in invoking the work-product privilege because the descriptions of the documents do not prove they were created with litigation in mind. Preservation letters are typically directives from an investigating agency instructing third-parties to maintain certain information that may be sought by the government at a later date. Proffer letters are agreements between prosecutors and individuals that limit the prosecutor's ability to use that information against them. Neither must be created with actual litigation in mind. Instead, these types of letters are typically created during the fact-gathering phase of an inquiry before the prospect of litigation has sufficiently arisen. Nowhere does defendant indicate that litigation was contemplated at the time they were created.

Defendant has revealed even less about the letter to the Pennsylvania Attorney General. It is simply described as a "letter," which is insufficient to justify withholding a document based on the work-product privilege.

Withholding the "letter" based on the deliberative process privilege must also fail because Defendant has failed to identify the process that it seeks to protect, nor does it say how the documents would reveal anything about that process. Instead, Defendant simply contends that it is an "unsigned draft" worthy of protection. That is not enough for Defendant to meet its burden, as "an agency cannot avoid disclosing non-deliberative or predecisional material merely by placing it in draft form." *Van Aire Skyport Corp.,* 733 F.Supp. at 321 (citing *Dudman Communications Corp. v. Dep't of the Air Force,* 815 F.2d 1565, 1569 (D.C.Cir.1987)). For a draft document to deserve protection by the deliberative process privilege, the government still must prove it is both deliberative and predecisional in nature.

Here, Defendant simply states it seeks to protect the process of "drafting various letters to assist in focusing the scope and direction of the investigation." *Vaughn* index, p. 16. But that is not enough to establish the asserted protection. The documents' authors are not revealed, nor does Defendant explain why release of these records would reveal the "back and forth" of any deliberative process.

### g.      Item 12

The work-product privilege was asserted in withholding Item 12, which consists of e-mails that were circulated among "federal government attorneys and law enforcement personnel who were assigned to the PSU/Sandusky investigation." *Vaughn* index, p. 17. Defendant states the documents contain "legal theories, opinions and strategies" related to "contemplation of litigation, if it was determined that laws were violated." *Id*. Defendant's assertion is an admission that litigation would only be contemplated if laws were violated. Since

there is no claim of any violation of any law, litigation could not have been contemplated at the time, and the work-product privilege does not protect these documents.

Defendant also cites the deliberative process privilege, but does not explain what process it is trying to protect or how the documents are deliberative and predecisional in nature.

### h.     Item 17

Item 17 consists of "grand jury subpoenas letters issue[d] to individuals and businesses." *Vaughn* index, p. 22. Defendant cites the work-product privilege, Exemption 6 and Exemption 7(C) in withholding these documents.  The work-product privilege does not protect these documents because by sending the documents to third parties, any privilege that may have existed was waived.

Defendant also cites Exemption 6 and 7(C) in withholding names, addresses and telephone numbers, but instead of redacting this specific information, it has decided to withhold the documents in their entirety. The Court should require Defendant to release the information it does not seek to protect.

### E.     Records withheld in part

Plaintiff challenges the government's withholding of the following documents that were partially withheld.

### 1.     EMAIL_0034855

Defendant cites the work-product privilege and the deliberative-process privilege in withholding a portion of EMAIL_0034855 (Exhibit H). *Vaughn* index, p. 23-24. The document appears to be a message from an AUSA reacting to a law enforcement conference presentation by a Pennsylvania state prosecutor involved in Sandusky's conviction. Defendant generically

states the redacted portion discusses "media that reported on various aspects of the PSU/Sandusky matter." *Id*. Releasing this portion would reveal the government's "discussion of legal strategies, theories and opinions related to the PSU/Sandusky investigation." *Id*.

The document itself refutes Defendant's description of the redaction. First, the lack of any email chain indicates it was not part of any back-and-forth discussion that would reveal any deliberative process. Second, Defendant has not explained how a description of a conference presentation would have any bearing on its inquiry, unlike a timely newspaper article that communicates a new development in a matter.

The redacted portion is not protected by the work-product privilege since work-product-protected documents are protected in their entirety. With regard to the deliberative process privilege, defendant has failed to state the deliberative process and the role the email played in that process.

### 2.     Emails sent the immediate aftermath of the release of the state grand jury presentment.

Defendant is withholding parts of 10 emails that discuss commentary of the popular press in the days subsequent to the release of the state grand jury presentment (Exhibit I)[6]. Like the previously contested document, Defendant cites the work-product privilege and the deliberative-process privilege for the withholding. *Vaughn* index, p. 23-24. Defendant states the redacted portions are "discussions ... concerning legal and investigation strategies related to the PSU/Sandusky investigation." It claims that releasing this information would reveal the

---

[6] These documents have been identified as EMAIL_0043527, EMAIL_0046636, EMAIL_0049085, EMAIL_0049090, EMAIL_0049095, EMAIL_0049102, EMAIL_0049108, EMAIL_0049116, EMAIL_0049126 and EMAIL_0049135.

government's "discussion of legal strategies, theories and opinions related to the PSU/Sandusky investigation." *Id.*

The news media pieces contained in these emails are commentary. They are not informing of any particular event or activity that would typically cause law enforcement to act or effect any law enforcement proceeding. On their face, they do not appear to be the type of document that would spur any sort of discussion about an official action the government should or should not take.

The work-product privilege does not apply to the redacted information because when these emails were sent, a law enforcement proceeding was not contemplated. Defendant's own Vaughn index states that litigation would only be contemplated "if it was determined that laws were violated." Defendant has not claimed that its work identified any violation of federal law, and no charges were ever filed. In addition, these emails were sent only three days after the release of the of the grand jury presentment[7]. It does not appear that any investigation by USAOMDPA had been initiated at this time, and as a result, litigation could not have been contemplated. Finally, the fact that Defendant chose to release portions of the documents indicates that the work-product privilege does not apply because if it did, the documents would be protected in their entirety.

Defendant has likewise failed to prove that the documents are protected by the deliberative process privilege because it has not identified any policy or decision to which the email discussions pertained.

### 3.      Emails from the U.S. Attorney

---

[7] EMAIL_0046636 is dated November 22, 2011.

Defendant is withholding portions of two emails authored by U.S. Attorney Peter J. Smith (Exhibit J). The withholding is based on the attorney-work product and deliberative process privileges.

The work-product doctrine does not protect these emails because Defendant has failed to prove that its investigation "focused upon specific events and a specific possible violation by a specific party." *In Re: Sealed Case, supra.* The deliberative process privilege does not protect this document because it was authored by (former) U.S. Attorney Peter J. Smith, the ultimate decision maker for USAOMDPA. Without describing the nature of the redacted information, Defendant's exemption claims must fail.

### 4.      An email with the subject "calendar matter"

Document EMAIL_0044684 is an email from U.S. Attorney Smith whose subject is "calendar matter"  (Exhibit K). Defendant is withholding portions of the email that discuss "newspaper articles and other media that reported on various aspects of the PSU/Sandusky matter." *Vaughn* index, p. 23-24. However, the email clearly does not involve any discussion of any news media article. Finally, because the information was sent by the head of the agency, they are unlikely to be of a predecisional or deliberative nature.

### 5.      Email discussion about an opinion piece to be published in newspaper.

Defendant is withholding four emails that contain some discussion about an opinion piece that was scheduled to be published in the Philadelphia Inquirer (Exhibit L). The author was Luke Zubrod, presumably kin to Gordon Zubrod, the prosecutor who headed USAOMDPA's investigation.

Defendant cites the work-product and deliberative process privileges in withholding these emails, but its description falls short. It's unclear whether the author of these emails is an attorney because Defendant only describes them as emails from "government attorneys and/or law enforcement personnel." *Vaughn* index, p. 23. Similarly, it is hard to imagine an opinion piece sparking a discussion about legal strategy that would qualify for protection under the deliberative process privilege.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully asks this court to **DENY** Defendant's motion for summary judgment and **GRANT** Plaintiff's motion for summary judgment.

Respectfully submitted,

Ryan Bagwell
444 Upham St.
Melrose, MA 01720
(608) 466-6195
ryan@ryanbagwell.com