IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RYAN BAGWELL, *Plaintiff*, v. U.S. DEPARTMENT OF JUSTICE, *Defendant*. | Civil Action No. 15-0531 (CRC) |

### DECLARATION OF NATASHA HUDGINS

I, Natasha Hudgins, declare the following to be a true and correct statement of facts:

1) I am an Attorney-Advisor with the Executive Office for United States Attorneys ("EOUSA"), United States Department of Justice. I am assigned to EOUSA's FOIA/PA Staff (the "Staff"), which is the component within EOUSA designated to administer both the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *amended by* the OPEN Government Act of 2007, Pub. L. No. 110-175, 121 Stat. 2524, and the Privacy Act of 1974 ("PA"), 5 U.S.C. § 552a. In that position, I have several responsibilities including: acting as a liaison with other divisions and offices of the Department of Justice ("DOJ") in responding to access requests as well as FOIA and PA litigation; reviewing FOIA and PA requests for access to records and case files located in this office and 94 United States Attorney's offices ("USAOs") throughout the nation; reviewing correspondence related to FOIA and PA requests; reviewing searches conducted in response to FOIA and PA access requests; identifying the location of records responsive to FOIA and PA requests; and preparing EOUSA's responses to FOIA and PA requests to ensure that

1

determinations to withhold or release responsive records are in accordance both the FOIA and the PA, as well as with DOJ regulations, *see* 28 C.F.R. §§ 16.3 *et seq.* and §§ 16.40 *et seq.*

2)      The Staff processes and reviews both FOIA and PA requests, responds to administrative appeals, and acts as agency counsel in lawsuits challenging its determinations.  As an Attorney-Advisor on the Staff, I have access to EOUSA's files, and I have authority to release and/or withhold records requested under the FOIA and PA.  I also have authority to explain the rationale for EOUSA's disclosure determinations.

3)      Due to the nature of my official duties, I am familiar with the procedures followed by EOUSA in responding to FOIA requests generally as well as the actions that EOUSA has taken in response to the FOIA request submitted by the plaintiff in this case, Ryan Bagwell (hereafter "Plaintiff").  The statements I make hereinafter are based on my review of the official files and records of EOUSA, my own personal knowledge, and information I acquired through the performance of my official duties.

4)      The purpose of this declaration is to provide the Court with information regarding EOUSA's final responses to plaintiff's FOIA request regarding the federal investigation surrounding the Sandusky sexual abuse scandal at Pennsylvania State University.  This declaration consists of: (1) relevant details regarding the contested withholdings in the inadvertently overlooked and remand documents, and (2) and information supporting the withholding of documents responsive to plaintiff's FOIA requests, but withheld from disclosure pursuant to the Freedom of Information Act ('FOIA") 5 U.S.C. §§ 552 exemptions (b)(3), (b)(5), (b)(6), (b)(7)(C), and (b)(7)(D). in accordance with *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert denied*, 415 U.S. 977 (1974).

5) During the initial briefing process in this matter, the USAO-MDPA realized that there were additional records that were overlooked during the original searches regarding Plaintiff's requests. Defendant made the court aware of the error, and on June 16, 2017, Defendant provided the declaration of AUSA Brian Simpson from the USAO-MDPA to explain how the records were inadvertently overlooked. Simpson's declaration outlined for the court the details regarding inadvertently overlooked records that were potentially responsive to Plaintiff's request and described that the records were obtained by federal grand jury subpoena(s). *See* ECF 46.

6) EOUSA began processing the records accordingly. After the continuous processing of records, on June 13, 2019 the parties attended an in person status hearing and the Court ordered the parties to meet and confer to further narrow the pool of potentially responsive records located within Bagwell II, the inadvertently overlooked records.

7) Out of those negotiations, the parties ultimately agreed to narrow the remaining pool of inadvertently overlooked records for review to emails that contained the names of 10 individuals over a 15-month period. That agreement narrowed the remaining pages of potentially responsive records to 11,648 pages.

8) On December 4, 2019, EOUSA provided a response to Plaintiff withholding 11,648 pages of records pursuant to (b)(3), (b)(6), (b)(7)(C). By letter dated April 12, 2021 EOUSA provided a supplemental response letter correcting the response to add (b)(7)(D) to the exemptions claimed.

9) Immediately following the processing of the inadvertently overlooked records, EOUSA proceeded to assess the remanded search records to begin production. The remanded

3

records consisted of approximately 540,620 pages of potentially responsive records. On February 19, 2020, the parties attended a telephonic status hearing before this Court. Per the minute order dated February 19, 2020, the parties met and conferred to narrow the number of remand records that would be processed. In March 2020 Plaintiff accepted Defendant's proposed terms, and the parties narrowed the scope of the remand records to approximately 4,982 pages of emails without attachments. Defendants further agreed to process the email attachments for up to 10 emails should plaintiff request it. *See* ECF 99, 100.

10) The Litigation Technology Service Center ("LTSC) maintains and provides assistance for the Relativity system that has been used throughout this matter to process and produce records to Plaintiff. The LTSC deduplicated the selected pool of records to the extent possible for processing. On October 21, 2020, Defendant completed it's processing of the agreed upon remand records and provided a response to Plaintiff. By that response, EOUSA released 45 pages in full, 153 pages in part, withheld 256 pages in full, and deemed 170 pages as duplicates. The October 2020 letter included the release in full and release in part page numbers. EOUSA intended to supplement the October 2020 letter. Because Plaintiff contested the referral of records in the October response, EOUSA provided a supplemental response on April 12, 2021 including the referred pages and the total withhold in full and duplicate pages from both the referred records and the original October response combined. That letter indicated EOUSA released 1 page in full, 14 pages in part, withheld 259 pages in full, and 174 pages were duplicates. A copy of the response letters for the inadvertently overlooked records, remand search records, and referral records as discussed below are attached hereto as Exhibit A.

**Exemption (b)(3):   Exempted by Statute**

11) FOIA Exemption 3 exempts from disclosure information which is: Specifically exempted from disclosure by statute… provided such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld. 5 U.S.C. § 552(b)(3).

12) In this instance, EOUSA withheld records that were protected from disclosure by Federal Rule of Criminal Procedure, Rule 6e.

13) Rule 6(e) confers broad protections on grand jury information in order to protect their secrecy. That secrecy is essential to the functioning of a grand jury because it encourages witnesses to testify, limits the ability of suspects and defendants to impede the work of the grand jury and the investigators, protects members of the grand jury, and shields individuals who are accused of criminal activities but ultimately exonerated prior to being charged.

14) Federal Rule of Criminal Procedure 6(e)(2)(B) is a statue that leaves no discretion about the decision to withhold information from the public.   Government attorneys and other individuals specified by statute are prohibited from disclosing information related to matters occurring before the grand jury.   Thus, EOUSA had no discretion in the release of the records relating to the grand jury proceedings.

15) In this instance, EOUSA withheld the "inadvertently overlooked" emails in full, as they would reveal the strategy and direction of the federal grand jury investigation.

16) As mentioned above, the records obtained by grand jury subpoena of potentially responsive records to review were significantly narrowed to a subset of emails specifically mentioning the names of 10 third party individuals.   The release of the nature and scope of the

emails obtained by grand jury subpoena from Pennsylvania State University is likely to pierce the veil of secrecy over the direction of the grand jury investigation. The emails sought are specific to those records that mention specific third parties and what the federal grand jury investigators were seeking to learn through the process of investigation relating to those persons. Further, the emails could reveal other persons and staff of interest to the investigation that were not made public during the federal or state investigations. Given the public nature of the Sandusky- PSU scandal, there is a lot of information that was released to the public regarding the details and findings of both the federal and state investigations. The emails have not been released publicly. This information combined with the release of emails relating to specific individuals could be used to determine other faculty or staff that may have been subject to investigation. Withholding this information also shields those individuals as they were ultimately not prosecuted by the federal government.

17) Prior to the parties' agreement to narrow the scope of the inadvertently overlooked records as described in Paragraphs 7 and 15 above, EOUSA made 5 releases of inadvertently overlooked records. In these earlier releases, EOUSA released to Plaintiff some records that the agency deemed were not inextricably intertwined with information that would reveal the inner workings of the grand jury process in the broader pool of records. Following the parties' agreement to narrow, EOUSA determined that no portions of the inadvertently overlooked records could be segregated.

18) Therefore, release of the information could violate the secrecy of the grand jury proceedings, and as a result the information is protected from disclosure by Exemption 3.

**Exemption (b)(7)(D):   Confidential Informants**

19) Exemption 7 threshold: Before an agency can withhold information pursuant to FOIA Exemption 7, it must first demonstrate that the records or information at issue were compiled for law enforcement purposes. Law enforcement agencies must demonstrate that the records at issue are related to the enforcement of federal laws, and that the law enforcement activity is within the duties of the agency.

20) Exemption 7(D) provides protection for "records or information compiled for law enforcement purposes [which] could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by a criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source."

21) The inadvertently overlooked records were obtained by federal grand jury subpoena to Pennsylvania State University ("PSU"). These documents were compiled by federal agencies for law enforcement purposes, in this instance, to assist federal investigators in their investigation. During the course of processing this request, EOUSA learned that PSU provided information pertaining to many individuals and the institution at large to federal investigators under the presumed confidentiality of the grand jury investigation. After being assigned as agency counsel, I contacted the Office of General Counsel for PSU to ensure the University was aware of this action. I spoke to the Associate General Counsel who expressed his belief that records turned over via grand jury subpoena would remain confidential, absent a federal criminal prosecution.

22) In the remand records, documents and information were provided by third parties,

often through counsel. EOUSA withheld references to confidentially provided records as well as the passwords to encrypted records provided to federal prosecutors. For example, EOUSA withheld portions of documents reflecting information provided to federal investigators from potential subjects, or their attorneys on a confidential basis. In most instances, EOUSA was able to segregate the document to release in part.

**Exemption (b)(6) and (b)(7)(C):   Privacy**

23) Exemption (b)(6) of the FOIA permits the withholding of personnel and medical files and similar files, which if disclosed, would constitute a clearly unwarranted invasion of personal privacy. 5 U.S.C. § 552(b)(6).   This exemption has been interpreted by the United States Supreme Court broadly so as to qualify all information pertaining to a particular individual.

24) In order to protect information under Exemption (b)(7), an agency must ensure that the information was compiled for law enforcement purposes. In this instance, the information contained in the inadvertently overlooked records were created and obtained in the course of the investigation for the purpose of handling the potential criminal prosecution of Jerry Sandusky and other Pennsylvania State University officials.

25) Similarly, exemption (b)(7)(C) protects from disclosure "records or information that was compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information…could reasonably be expected to constitute an unwarranted invasion of personal privacy."   5 U.S.C. § 552(b)(7)(C).

26) EOUSA determined that, as an initial matter, the threshold for Exemption 6 was satisfied because the information withheld applies to particular people. EOUSA also determined that the threshold for Exemption 7(C) was satisfied because records in question were created for

the purpose of handling the potential criminal prosecution of Jerry Sandusky and other Pennsylvania State University officials.

27) EOUSA asserted Exemptions (b)(6) and (b)(7)(C) to protect the names and identifying information relating to third parties in both the inadvertently overlooked and remand search records. The disclosure of information contained in the records could subject individuals to an unwarranted invasion of their personal privacy by leading efforts to contact them directly, gain access to their personal information, or subject them to harassment or harm.

28) For example, EOUSA withheld the names, contact information and personal identifying information of third party students and faculty. The release of names or identifying information related to third parties not publicly acknowledged by law enforcement could damage the individuals' reputation by virtue of being associated with any law enforcement investigation.

29) In the remand search records, EOUSA also withheld the identities of third parties providing tips or other information to government prosecutors through the USAO-MDPA public contact email address. These individuals appeared to be third parties without any association with Pennsylvania State University.

30) This information would provide little or no information regarding the government's performance of its duties. Thus, no public interest would counterbalance the individuals' privacy right in the information withheld under this exemption.

31) The EOUSA asserted Exemptions (b)(6) and b(7)(C) to protect such individuals and those privacy interests in documents and are further detailed in the attached Vaughn Index.

**Exemption 5:**     **Deliberative Process Privilege & Attorney Work Product**

32) The attorney-work product privilege of exemption 5 protects "inter-agency or intra

agency memorandum or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).   The attorney work product privilege is incorporated into exemption 5 and serves to protect documents and other memoranda prepared by an attorney in contemplation of litigation. The protection extends to communications concerning legal theories and litigation strategies within and among federal law enforcement agencies created in anticipation of a criminal prosecution and for the furthering of a criminal prosecution.

33)   The deliberative process privilege of exemption 5 is meant to "prevent injury to the quality of agency decisions." *See NLRD v. Sears Roebuck & Co.*, 421 U.S. 132, 151 (1975).   The basis of the privilege is to (1) encourage open, frank, discussions on matters of policy between subordinates and superiors; (2) protect against premature disclosure of proposed policies before they are actually adopted; and (3) protect against public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's actions. The deliberative process privilege protects the decision making processes of agencies.

34)   In this case, exemption (b)(5) were applied to portions of the remand search records.   EOUSA withheld internal USAO-MDPA emails that discussed whether or not prosecutors should subpoena records from certain third party individuals. These emails contained investigation and litigation strategy regarding the prosecution of individuals related to the PSU-Sandusky matter.

35)   EOUSA also withheld certain intra-agency communications between federal prosecutors in USAO-MDPA and the Department of Education, FBI, the US Postal Inspection Service, or the Criminal Division of DOJ.   The intra-agency discussions regard the developments

of investigators and prosecutors, and discuss the potential investigation strategy options the agencies should take to move the investigation forward. The communications included the agencies' legal impressions as the investigation continued to unfold.

**Referrals**

36) Plaintiff noted in the February 1, 2021 Joint Status Report (ECF No. 107), that he is contesting the referrals sent to the Department of Education and the FBI. It is unclear what specifically Plaintiff is contesting.

37) Under the FOIA, each agency is subject to the FOIA is responsible for processing its records. Some agencies, including the Department of Justice have de-centralized processing of records, where each component is responsible for the processing of its records. For a referral, the records generally were created by or are the primary equity of the receiving agency. Thus, the records are sent for the primary agency to make a final determination on the records in question and provide a final response directly to the requester. This is also in the best interest of requesters, as generally the requester can receive the final response more quickly than if the records had to be transmitted back to the agency conducting the initial search.

38) In this case, referrals were made from the remand search records. For the Department of Education, EOUSA referred emails and documents created by the Department of Education relating to Pennsylvania State University.

39) In the mix of remand search records, there were some records of Department of Education equity that EOUSA could not determine if the records were actually responsive to Plaintiff's request or related to a separate Pennsylvania State University matter. Out of an abundance of caution, EOUSA referred the records where there was uncertainty regarding their

responsiveness to the Department of Education to make the final determination.

40) There were a few documents of primary equity referred to the FBI for final decision.

41) EOUSA checked on the status of the referrals. As of today EOUSA was unable to obtain a final response from the Department of Education or the FBI on the status of their referrals.

42) Given the agencies have not yet responded to the referrals to my knowledge EOUSA has made withholding determinations and included them in the supplemental response to prevent injury or delay to Plaintiff. By today's response, EOUSA released 1 page in full, released 9 pages in part, withheld 3 pages in full, and 4 pages were deemed duplicates. Today's response letter was dated October 20, 2020 by administrative error.

**Segregability**

43) Under FOIA, federal agencies are required to release any portion of the record that is non-exempt and this is reasonably segregable from the non-exempt material.   If non-exempt information contained in the record is inextricably intertwined with exempt information, then reasonable segregation is not possible.

44) During the processing of this request, each page was individually examined line-by-line by members of the Staff to identify non-exempt information which could be reasonably segregated and released.

45) EOUSA has provided Plaintiff with all non-exempt responsive to his FOIA request and properly withheld information pursuant to the exemptions cited above.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

Executed this 12th day of April, 2021.

_____
Natasha Hudgins
Attorney-Advisor,
Freedom of Information/Privacy Act Staff
Executive Office for United States Attorneys