**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RYAN BAGWELL** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 1:15-cv-00531 (CRC) |
| | ) |
| **UNITED STATES DEPARTMENT OF** | ) |
| **JUSTICE** | ) |
| | ) |
| Defendant. | ) |
| | ) |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff Ryan Bagwell hereby opposes Defendant's third Motion for Summary Judgment (ECF No. 109) and cross moves for partial summary judgment. For reasons more fully explained herein, Defendant has failed to prove the remaining withheld records are exempt from the Freedom of Information Act's (FOIA) disclosure requirements. Specifically, Plaintiff seeks summary judgment regarding the government's claim that the "inadvertently overlooked records" are protected by FOIA exemptions 3 and 7(D), and further asks the Court to order their immediate release with redactions allowed for certain privacy considerations. Plaintiff opposes the government's motion as to all other withholding claims.

**BACKGROUND**

This is a FOIA case involving Plaintiff's request dated April 30, 2014 seeking "any and all records of investigations between November 1, 2011 and today that pertain to allegations of child sexual abuse that occurred on the campus of The Pennsylvania State University (PSU)." (ECF No.1). One such investigation surrounded conduct of Gerald Sandusky, a former PSU

football coach who was convicted of child sexual abuse by a Pennsylvania court in 2012. Separately, the U.S. Attorney for the Middle District Pennsylvania investigated certain aspects of Sandusky's criminal actions, but did not file charges in the case. To this date, next to nothing about the investigation has been revealed publicly.

The relevant procedural history of this case begins on August 16, 2017, when the government was finalizing its production obligations prior to filing its second motion for summary judgment. On that date, the government told Plaintiff and the Court that it had "inadvertently" failed to review 260,800 pages of records for possible production (ECF No. 46). The Court ordered the parties to file a proposed schedule for processing what the Court would begin referring to as the "inadvertently overlooked records." *Id*.

Defendant moved for summary judgment as to all other records processed by that time (ECF No. 57), and Plaintiff cross-moved for summary judgment (ECF No. 61). The Court issued its decision on March 2, 2018 (ECF No. 70) finding Defendant failed for a second time to prove that it conducted an adequate search for the requested records, and also failed to prove that it properly withheld a set of Pennsylvania state grand jury materials under Exemption 7(A). *Id*. It subsequently ordered the parties to 1) figure out a set of revised search terms for Defendant's email system, and 2) submit revised declarations and *Vaughn* indices concerning the state grand jury records with the next set of summary judgment briefing filed. *Id*.

The Court issued its next scheduling order on April 25, 2018 (see minute order of April 25, 2018). Therein, it ordered the government to process the "inadvertently overlooked" records by April 25, 2019. Later, after the government conducted additional searches, the Court ordered EOUSA to process the remand search documents by April 26, 2020 (see minute order of July 16, 2018).

A year went by, but incredibly, on April 25, 2019, the government informed the Court it had not finished processing the "inadvertently overlooked" records (ECF No. 87). The Court held another status conference on June 11, 2019, and the parties continued to discuss a plan for processing the "inadvertently overlooked" documents. The parties were able to reduce the number of records for processing to 11,648 pages. On October 17, 2019, the Court issued a minute order directing the government to finish processing the "inadvertently overlooked" records by April 20, 2020. On December 4, 2019, more than two years after locating the "inadvertently overlooked records," the government informed Plaintiff it had finished processing them and it would withhold all 11,648 pages pursuant to FOIA Exemptions 3, 6 and 7(C) (Exhibit A).

The government then turned its attention to processing 4,982 pages comprising the "remand search" records. The government made two releases. The first, on October 21, 2020, consisted of 153 pages that were partially redacted, citing exemptions 3, 5, 6, 7(C), 7(D) and 7(E) (Exhibit B). The second, on December 30, 2020, consisted of 18 pages released with redactions and 4 pages withheld in full. (Exhibit C). The government cited exemptions 3, 6, 7(C) and 7(D). This briefing schedule was subsequently ordered.

As part of the government's motion for summary judgment on April 12, 2021, EOUSA told Plaintiff that it had reviewed and processed additional pages that consisted of documents originally referred to the Department of Education and the FBI for review and potential release[1]. (Exhibit D). The review resulted in 14 pages being released in part and 259 pages withheld in full[2]. The government cited exemptions 5, 6 and 7(C) to support its redactions and withholdings.

---

[1] The government explained that it decided to take responsibility for reviewing and releasing the referred documents because it could not determine whether the FBI and Department of Education had responded to Plaintiff. Hudgins Decl. ¶ 42. Plaintiff confirms that those agencies have yet to provide their own response regarding the referral documents.

[2] The April 12, 2021 letter from EOUSA states 14 pages were released in part and 259 pages were withheld in full, while the Hudgins Declaration states only 9 pages were withheld in part and 3 pages were withheld in full.

## ARGUMENT

Summary judgment is appropriate when there is no genuine issue as to the material facts, and the moving party demonstrates it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). FOIA lawsuits are typically resolved on cross-motions for summary judgment. *Reliant Energy Power Generation v. FERC*, 520 F. Supp. 2d 194, 200 (D.D.C. 2007). A court reviews agency handling of a FOIA request *de novo*. 5 U.S.C. § 552(a)(4)(B); *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984).

The government bears the burden to establish that its claimed exemptions apply to each document for which it invokes an exemption. *Am. Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 619, 393 U.S. App. D.C. 384 (D.C. Cir. 2011). The government cannot satisfy its burden with affidavits that are vague or conclusory, or merely parrot the statutory standard. *Consumer Fed'n of Am. v. U.S. Dep't of Agric.*, 455 F.3d 283, 287, 372 U.S. App. D.C. 198 (D.C. Cir. 2006). Evidentiary declarations must describe the justifications for withholding in "specific detail, demonstrate[ing] that the information withheld logically falls within the claimed exemption." *Am. Civil Liberties Union*, 628 F.3d at 619. "When demonstrating that a FOIA exemption applies to some portion of a document withheld, the agency must also provide a detailed justification for its non-segregability," *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776, 354 U.S. App. D.C. 49 (D.C. Cir. 2002), and the agency should "describe what portion of the information is non-exempt and how that material is dispersed throughout the document," *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 261, 184 U.S. App. D.C. 350 (D.C. Cir. 1997).

**I.      EOUSA has failed to prove that the "inadvertently overlooked" records are exempt from the FOIA's disclosure requirements.**

The government is withholding 11,648 pages of records pursuant to exemptions 3, (relating to grand jury secrecy) and 7(D). It has failed to prove that the cited exemptions protect these records.

### A.    Exemption 3

Exemption 3 permits an agency to withhold records "specifically exempted from disclosure by statute" if the statute (1) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (2) establishes particular criteria for withholding or refers to particular types of matters to be withheld. 5 U.S.C. § 552(b)(3). Defendant has identified Rule 6(e) of the Federal Rules of Criminal Procedure (relating to grand jury matters) as the statute that prohibits disclosure of these records. Rule 6(e)(2)(B) provides that various "persons must not disclose a matter occurring before the grand jury." Those subject to the disclosure prohibition include attorneys for the government. *Id*.

The government states that these records were "obtained by grand jury subpoena" and consist of "a subset of emails specifically mentioning the names of 10 third party individuals." *Declaration of Natasha Hudgins* ¶ 15-16 (ECF No. 109-3) (Hudgins Decl.). According to the government, they appear to "mention specific third parties and what the federal grand jury investigators were seeking to learn through the process of investigation relating to those persons." *Id*. Finally, the government surmises that these records "could reveal other persons and staff of interest to the investigation that were not made public during the federal or state investigations." *Id*. These statements are inadequate to support the wholesale withholding of 11,648 pages of records.

"There is no *per se* rule against disclosure of any and all information which has reached the grand jury chambers ... The touchstone is whether disclosure would 'tend to reveal some

secret aspect of the grand jury's investigation' such matters as 'the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of the jury, and the like.'" *Senate of Puerto Rico v. U.S. Dept of Justice*, 823 F.2d 574, 582 (D.C. Cir. 1987) (citation omitted). To prevail on its claim of 6(e) protection, Defendant must demonstrate "some affirmative demonstration of a nexus between disclosure and revelation of a protected aspect of the grand jury's investigation." *Senate of Puerto Rico*, supra., at 584.

Information such as witness lists and actual grand jury subpoenas are typically protected from disclosure by Rule 6(e). However, none of the withheld information described by the government would categorically reveal some secret aspects of the grand jury process. The information at issue are emails obtained as part of an investigation into potential wrongdoing, but this does not prevent their disclosure because "[t]he mere fact the documents were subpoenaed fails to justify withholding under Rule 6(e)." *Labow v. Department of Justice*, 831 F.3d 523, 529 (D.C. Cir. 2016). Instead, the government must prove that the documents themselves would reveal some protected aspect of the grand jury process.

It is hard to imagine how emails obtained from a third party could reveal a protected grand jury secret. The government focuses its objection to disclosure on the potential for the public to find what "grand jury investigators[3]" were seeking to learn during their inquiry. *Hudgins Decl.* ¶ 16. But the only indication on the record that these emails pertain to a grand jury matter in any way is the government's own invocation of Exemption 3. Without that, Plaintiff "would never have known that any of the documents had been subpoenaed by a grand jury." *Labow,* 831 F.3d at 530. Barring disclosure simply because the government revealed a connection to the grand jury on its own is not allowed because "the relevant question is whether

---

[3] As far as Plaintiff is aware, there is no such thing as a "grand jury investigator."

the documents would have revealed the inner workings of the grand jury had they been released in response to the initial FOIA request." *Id*.

### B.        Exemption 7(D)

In addition to its Exemption 3 claims, the government asserts that the inadvertently overlooked information, furnished to it purely due to a grand jury subpoena, is also protected by Exemption 7(D). This exemption protects "information furnished by a confidential source" when "compiled by criminal law enforcement authority in the course of a criminal investigation." 5 U.S.C. § 552(b)(7). To prevail, the government must demonstrate that the source, in this case, PSU, "provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred." *Dep't of Just. v. Landano*, 508 U.S. 165, 174 (1993). Using Exemption 7(D) to prevent the disclosure of information provided in response to a grand jury subpoena is a novel theory. The government cites no supporting cases, and Plaintiff has similarly failed to locate any that support or refute such an application.

In support of its Exemption 7(D) claim, the government declared:

> During the course of processing this request, EOUSA learned that PSU provided information pertaining to many individuals and the institution at large to federal investigators under the presumed confidentiality of the grand jury investigation. After being assigned as agency counsel, I contacted the Office of General Counsel for PSU to ensure the University was aware of this action. I spoke to the Associate General Counsel who expressed his belief that records turned over via grand jury subpoena would remain confidential, absent a federal criminal prosecution.

*Hudgins Decl.* ¶ 21. The government does not contend that an express assurance of confidentiality was ever promised to PSU. Nor does PSU ever claim that confidentiality was expressly promised. Instead, the government only provides hearsay evidence that an attorney for

a corporate entity has verbally expressed a belief that information turned over in response to grand jury subpoena nearly ten years later was provided in confidence.

Because no express assurance of confidentiality has been asserted, to prevail on its Exemption 7(D) claim, the government must demonstrate that confidentiality was inferred by PSU under the circumstances that existed at the time the information was provided. (The question is whether "the particular source *spoke* with an understanding that the communication would remain confidential." *Landano,* 508 U.S. 165 at 172. It is not enough to show that counsel for a private institution is claiming years after the fact that confidentiality was presumed at the time, as the government is attempting to do in this case.

D.C. Circuit has prescribed the factors that should be considered when determining whether confidentiality was implied at the time:

> When no express assurance of confidentiality exists, courts consider a number of factors to determine whether the source nonetheless spoke with an understanding that the communication would remain confidential. These factors include the character of the crime at issue, the source's relation to the crime, whether the source received payment, and whether the source has an ongoing relationship with the law enforcement agency and typically communicates with the agency only at locations and under conditions which assure the contact will not be noticed.

*Roth v. U.S. Department*, 642 F.3d 1161, 1184 (D.C. Cir. 2011) (internal quotation marks omitted). Crimes of a violent or serious nature deserve greater consideration for inferred confidentiality because the risk of retaliation is higher. *Landano,* 508 U.S. 165 at 179. In addition, when the source is an "institution" as it is in this case, greater disclosure should occur because these sources typically provide a "wide variety of information" and the prospect of retaliation or harm is far less likely than if the source were an individual. *Id.* at 176.

In the instant matter, the government has failed to address any of the *Roth* factors in its declaration. It provides no description of the nature of the crime, nor does it disclose PSU's

relationship to the crime. In fact, it's unlikely these factors can ever be satisfied. Since no actual charges were filed, the Court should assume that no crime was ever identified and PSU never had a relationship to any crime whatsoever.

Notwithstanding, assuming *arguendo* that the Court finds confidentiality could be inferred because PSU was responding to a grand jury subpoena, the Court should find that such an inference may only be limited to the protections afforded by Rule 6(e). In other words, it may be reasonable to believe that information turned over in response to a grand jury subpoena would be protected from disclosure, but only to the extent that the information is actually protected by grand jury rules. And as discussed above, the evidence supplied by the government is insufficient to prove these "inadvertently overlooked" records are protected by grand jury rules.

### C.       Exemptions 6, 7(C) and segregability

Exemption 6 of the FOIA permits the withholding of personnel and medical files and similar files, which if disclosed, would constitute a clearly unwarranted invasion of personal privacy. 5 U.S.C. § 552(b)(6). Similarly, Exemption 7(C) protects from disclosure "records or information that was compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information…could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). The government invoked these exemptions to protect "the names and identifying information relating to third parties." *Hudgens Decl.* ¶ 27.

Plaintiff agrees that the identities of third-party individuals involved in an investigation are generally protected from disclosure. But the mere fact that these documents mention individuals does not by itself justify withholding these records in their entirety. "When demonstrating that a FOIA exemption applies to some portion of a document withheld, the

agency must also provide a detailed justification for its non-segregability," (see *Johnson*, *supra*.) and the agency should "describe what portion of the information is non-exempt and how that material is dispersed throughout the document." *Mead Data, supra.* EOUSA has done neither, and therefore, it cannot meet its burden of proving that it may fully withhold this information based on exemptions 6 and 7(C) are proper. The Court should order the government to segregate and release any information that is not protected by exemptions 6 and 7(C).

## II.    EOUSA has not met its burden of proving it may withhold the so-called "remand search" records.

After reviewing the "remand search" records, EOUSA withheld 4 pages in full and 171 in part. EOUSA release letters (Ex. B, C). In doing so, the agency invoked several exemptions, but has only provided evidentiary support for exemptions 5, 6 and 7(C).

### A.    Exemption 5

The FOIA's Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The exemption covers "those documents, and only those documents [that are] normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). Specifically, Defendant has invoked the attorney-work product privilege and the deliberative process privilege, which are among the privileges that may be used to withhold records pursuant to Exemption 5.

#### 1.    Defendant has failed to prove the applicability of the attorney-work product privilege.

The attorney work-product privilege protects "documents and tangible things that are prepared in anticipation of litigation." Fed. R. Civ. P. 26(b)(3)(A). Not every document prepared in anticipation of litigation is protected, however. Only those that would reveal the "mental

impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation" are covered by the work-product privilege. Fed. R. Civ. P. 26(b)(3)(B). To successfully invoke the work-product privilege, Defendant must demonstrate that the document was prepared *in anticipation of litigation*. To do this, it must satisfy this Circuit's so-called "because of" test, which holds that "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *United States v. Deloitte LLP*, 610 F.3d 129, 137, 391 U.S.App.D.C. 318 (D.C. Cir. 2010). For that test to be met, "the attorney who created the document must have 'had a subjective belief that litigation was a real possibility,' and that subjective belief must have been 'objectively reasonable.'" *Nat'l Ass'n of Criminal Def. Lawyers v. U.S. Dep't of Justice Exec. Office for U.S. Attorneys,* 829 F.3d 741 (D.C. Cir. 2016) (NACDL).

The Court previously found in this case that EOUSA had adequately proven litigation was sufficiently "in mind" when these records were created. See *Bagwell v. Dep't of Justice*, No. 15-cv-0531 (D.D.C. March 22, 2018), p. 15. In doing so, it rejected the idea that the government must demonstrate the existence of a  "specific claim" at the time the records were created in order for them to be considered attorney-work product. *Id*., citing *NACDL,* 829 F.3d at 253. The Court ultimately found that "where an attorney prepares a document in the course of an active investigation focusing upon specific events and a specific possible violation by a specific party, it has litigation sufficiently 'in mind' for that document to qualify as attorney work product." *Id.*, quoting *SafeCard Servs. Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991).

The practical result of the *SafeCard* standard as interpreted by the Court is that any email or document created by a prosecutor that chronicles an investigation is automatically protected by the work-product privilege and of limits to the public. Any communication from a prosecutor

regarding an investigation is bound to contain "mental impressions, conclusions, opinions, or legal theories" of some sort. See Fed. R. Civ. P. 26(b)(3)(B). Such a broad exclusion from the FOIA's disclosure requirements is inconsistent with the purpose of the FOIA, which exists "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). Indeed, the *SafeCard* court recognized the potential for the government to abuse its own standard and cautioned against invoking it in a manner that precludes the release of virtually all information about an investigation conducted by government prosecutors. "The work product exemption, read over-broadly, could preclude almost all disclosure from an agency with substantial responsibilities for law enforcement. We do not so read the exemption, however." *SafeCard Servs.*, 926 F.2d at 1203.

Yet that is exactly what has happened in this case. While EOUSA released hundreds of pages of partially redacted information, virtually none reveal what government employees were up to during the investigation. The agency has provided numerous scheduling requests and news articles; emails from a private citizen who provided his independent analysis into criminal violations; an email asking if someone looked at the contents of some boxes; an inquiry about an undisclosed potential crime in another jurisdiction, and; some back and forth commentary between prosecutors about Sandusky's state trial while it was ongoing and reported by the media. All of the "remand emails" at issue in this case that would reveal how the investigation proceeded or what the government actually did have been withheld in full as protected work product. The standard applied by EOUSA has precluded "almost all disclosure from an agency with substantial responsibilities for law enforcement," which is exactly what the *SafeCard* court

worried would happen. *Id*. To ensure the privilege is not abused, the Court must require a higher evidentiary standard than what the record reflects at this time.

*SafeCard* provides an evidentiary framework for determining whether an investigation was far enough along to trigger application of the work-product privilege. In that case, the government provided the "specific sections of the securities laws" that may have been violated. *SafeCard Servs.*, 926 F.2d at 1203 (emphasis added). It also demonstrated that it "reached the stage in its investigation at which it was comparing the accumulated facts to the caselaw and evaluating the legal theories it considered pursuing." *Id*. Finally, the government had taken testimony from at least 15 witnesses, discussed granting immunity to another, and was preparing an advisory memorandum to the Commission on whether to file an injunctive action." *Id*. Based on those specific details, the *SafeCard* court found that the government had litigation sufficiently in mind to qualify for the attorney work-product privilege.

This Court previously found other documents in this case were protected by the work-product privilege after the government demonstrated they "were created by attorneys during a law enforcement investigation into allegations of specific illegal activity (child sex abuse and concealing such abuse) by specific people (Sandusky and others at the University)." See *Bagwell*, p. 16. But those general assertions don't contain the level of specificity necessary to prove the application of the work-product privilege. The government hasn't revealed the specific laws that had potentially been violated. There's no evidence that it ever reached the point where it was "comparing the accumulated facts to the caselaw and evaluating the legal theories it considered pursuing." Although the terms "mental impressions" and "legal analysis" are mentioned several times in the *Vaughn* index, such boilerplate language that "merely parrot[s] the statutory standard" are not enough to prove that the documents at issue are truly protected by

the work-product privilege. *Consumer Fed'n of Am. v. U.S. Dep't of Agric.*, 455 F.3d 283, 287, 372 U.S. App. D.C. 198 (D.C. Cir. 2006).

Instead, the evidence on the record reflects the existence of a nonspecific investigation that only began after another agency charged Sandusky publicly. This was a classic "fishing expedition" that never resulted in any charges. There is simply no evidence on the record that any prosecutor believed there was a likelihood of an actual case being tried. Indeed, at no point in this case has EOUSA ever claimed that bringing charges was ever a real possibility.

Finally, while an agency might be entitled to the presumption that the existence of an investigation demonstrates that actual litigation was enough of a possibility to trigger the work-product exemption, the D.C. Circuit never said that such a presumption could never be refuted. Indeed, the Circuit court specifically stated that an investigation is only "circumstantial evidence that the agency lawyer prepared the document with future 'litigation in mind.'" *SafeCard Servs.,* 926 F.2d at 1202.

In addition to facts on record, one piece of evidence further refutes the idea that prosecutors had advanced their investigation to the point where they actually believed charges were a real possibility. The so-called "diary" of Kathleen McChesney, an investigator with the law firm of Freeh, Sporkin & Sullivan[4], chronicled a February 5, 2012 meeting with federal prosecutors. (Exhibit E) (McChesney Diary). According to the diary, McChesney wrote that federal prosecutors' investigation "seems to come from newspaper reports, doesn't seem that they have a witness" and that prosecutors "appear to be fishing." McChesney Diary, p. 17. That sentiment was repeated in a separate meeting on March 7, 2012, in which, according to

---

[4] PSU hired the Law Firm of Freeh, Sporkin & Sullivan to conduct an investigation into how PSU handled reports child sexual abuse on campus.

McChesney, Louis J. Freeh told his private investigators that "Penn State does not seem to be the USA's target -may be fishing." McChesney Diary, p. 28.

### a. The Court should order EOUSA to segregate and release any information in the "remand emails" that is not attorney-work product.

Documents considered attorney-work product have historically been protected from disclosure in their entirety. As a result, "an agency need not segregate and disclose non-exempt material if a record is 'fully protected' as work product." *NACDL* at 557. However, the idea that EOUSA can withhold an entire document that contains work product in addition to non-work product information is no longer valid. In *NACDL*, the full D.C. Circuit Court, in lieu of granting a petition for rehearing, remanded the matter to the district court to consider whether portions of an EOUSA policy manual contained non-work product material that could be segregated and potentially released. It did not require the district court to parse the material "line-by-line" or segregate information "dispersed throughout the document." *NACDL* at 257. "Instead, the emphasis is on segregation of non-exempt material found in 'logically divisible sections.'" *Id*. The district court eventually ordered the release of not just entire sections of the withheld material, but individual paragraphs as well. *Nat'l Ass'n of Criminal Def. Lawyers v. Exec. Office for U.S. Attorneys,* No. 14-269 (CKK) (November 15, 2017)[5].

The Court should undergo a segregability analysis that is consistent with the practice established in NACDL. According to EOUSA's *Vaughn* index, many of the withheld emails are between prosecutors and non-attorney investigators, making it likely that non-work product information is contained therein. In addition, many of the *Vaughn* items are listed as "Email

---

[5] This opinion can be found at
https://storage.courtlistener.com/recap/gov.uscourts.dcd.164706/gov.uscourts.dcd.164706.41.0.pdf.

Chain," which generally consist of several individual emails, each which could serve as a logically divisible section potentially appropriate for segregability.

> ### 2.     Defendant has failed to prove the applicability of the deliberative process privilege.

Exemption 5 also encompasses the deliberative process privilege, which allows EOUSA to "withhold 'all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be.'" *Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 4 (D.C. Cir. 2014) (quoting *Sears, Roebuck*, 421 U.S. at 153). It is "limited to documents that are 'predecisional' and 'deliberative,' meaning 'they reflect advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated, [or] the personal opinions of the writer prior to the agency's adoption of a policy.'" *Id.* (quoting *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 875, 389 U.S.App.D.C. 356 (D.C. Cir. 2010)).

To meet its burden of proving the predecisional and deliberative nature of the withheld documents, the government must "establish what deliberative process is involved, and the role played by the documents at issue in the course of that process." *Senate of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 585-86 (D.C. Cir. 1987) (quoting *Coastal States*, 617 F.2d at 868). It must further "describe the nature of the decision making authority vested in the office or person issuing the disputed document[s], and the positions in the chain of command of the parties to the documents." *Elec. Frontier Found. v. U.S. Dep't of Justice*, 826 F.Supp.2d 157, 168 (D.D.C. 2011) (quoting *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 258 (D.C. Cir. 1982)). Documents sent from subordinates to superiors are more likely to be deliberative in character than documents traveling in the opposite direction. *Senate of P.R., supra*.

"The need to describe each withheld document when Exemption 5 is at issue is particularly acute because the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process." *Animal Legal Def. Fund, Inc. v. Dep't of Air Force*, 44 F.Supp.2d 295, 299 (D.D.C. 1999) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980)).

Finally, once a document is "is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public," it can no longer be considered predecisional. *Coastal States*, 617 F.2d at 866.

Further, the deliberative process privilege "does not protect documents in their entirety; if the government can segregate and disclose non-privileged factual information within a document, it must." *Loving v. Dep't of Defense*, 550 F.3d at 38 (citing *Army Times Publ'g Co. v. U.S. Dep't of Air Force,* 998 F.2d 1067, 1071 (D.C. Cir. 1993)).

Here, the Court should conduct a segregability analysis to ensure that factual information is released. For example, an investigator emailing a status update or conveying the result of his investigation to a prosecutor would be factual in nature. The Court should require the government justify the withholding of each withheld page instead of allowing it to address entire email chains.

## III.    EOUSA has failed to demonstrate the referred records are protected by the claimed exemptions.

EOUSA is withholding 259 pages of records referred to other agencies, citing exemptions 5, 6 and 7(C). No evidentiary support for withholding these records has been submitted, and as a result, Plaintiff asks the Court to order their immediate release.

**IV.**   **EOUSA has failed to satisfy the so-called "foreseeable harm" standard.**

Even if the Court agrees with the government that the claimed exemptions protect the withheld information, EOUSA still must prove it "reasonably foresees that disclosure would harm an interest protected by [a FOIA] exemption." 5 U.S.C. § 552(a)(8)(A). "Stated differently … an agency must release a record—even if it falls within a FOIA exemption—if releasing the record would not reasonably harm an exemption-protected interest and if the law does not prohibit the disclosure." See *Judicial Watch v. U.S. Dep't of Commerce*, Case No. 17-cv-1283, 10 (D.D.C. Nov. 25, 2020) (quoting *Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 72 (D.D.C. 2018)). This so-called "foreseeable harm" standard is relatively new, having been enacted by Congress as part of the FOIA Improvement Act ("FIA") of 2016, Pub. L. No. 114-185, 130 Stat. 538.

While Plaintiff's information request was submitted years before the enactment of the FIA, the standard still applies because, as more fully explained below, the law was enacted prior to when EOUSA began to process the requested records, and as a result, the amendments govern the standards by which EOUSA may decide to withhold the requested information at issue in this motion.

**A.**   **The FOIA Improvement Act of 2016 applicable to Plaintiff's FOIA request.**

The FIA of 2016 became law on June 30, 2016. Section 6 (related to applicability) provides:

> This Act, and the amendments made by this Act, shall take effect on the date of enactment of this Act and shall apply to any request for records under section 552 of title 5, United States Code, made after the date of enactment of this Act.

Pub. L. No. 114-185, 130 Stat. 538 § 6. While the FIA appears to limit its application to conduct occurring in response to requests made after it was enacted, "[a] statement that a statute will

become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 257 (1994). And while the FIA specifically applies to records requests made after June 30, 2016, it does not expressly forbid application to records requests made prior to June 30, 2016[6]. In fact, Section 6 of the FIA is silent as to the question of whether the FIA is meant to apply to FOIA requests in litigation at the time of enactment.

When a statute does not "expressly prescribe" the Act's temporal reach, the Court "must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* at 280. A statute with a retroactive effect generally should not govern. *Id*. However, "[w]hen the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive." *Id*. at 273.

The FIA provides no retroactive effect on the instant case. The change that took effect on June 30, 2016 governed agencies' withholding decisions under the FOIA by allowing them to "withhold information … only if the agency reasonably foresees that disclosure would harm an interest protected by an exemption." Those withholding decisions took effect well after the FIA's effective date. EOUSA made its decision to withhold the "inadvertently overlooked" records in full on December 4, 2019. As for the "remand search records," it began to 1make withholding decisions on October 21, 2020. When applied to the records at issue in this motion, the Act would only impose additional obligations on EOUSA's conduct <u>after</u> enactment, not before. It would only "affect the propriety of prospective relief," i.e. to permit EOUSA to withhold

---

[6] For example, the Act does not state that it shall "only" apply to any request made after enactment.

documents if doing so would be reasonably harmful. Therefore, applying the FIA to this case would not be retroactive.

Other courts have entertained the idea that FIA may be applicable to requests filed prior to June 30, 2016. The Second Circuit Court of Appeals has entertained application of the FIA to FOIA cases that were filed prior to the FIA's enactment. In *Sorin v. U.S. Dep't of Justice,* the court did not find that the FIA was inapplicable to a 2015 FOIA request. *Sorin v. U.S. Dep't of Justice*, 18-99-cv, 6 (2d Cir. Dec. 6, 2018). And in *Florez v. Cent. Intelligence Agency, the court declined to explicitly find that the FIA was inapplicable to a FOIA request filed in 2013. Florez v. Cent. Intelligence Agency*, 829 F.3d 178, 190 n.14 (2d Cir. 2016) ("We express no view as to the effect, if any, of [the FIA] upon FOIA law generally … in this case. We leave these issues to the District Court, equipped with the relevant facts, in the first instance."). In this district, Judge Chutkan did not reject the FIA's application to FOIA requests filed in 2011 (*Crisman v. Dep't of Justice*, Case No. 12-cv-1871 (D.D.C. Mar. 25, 2019) and 2015 (*Long v. Cent. Intelligence Agency*, Civil Case No. 15-cv-1734 (D.D.C. Sep. 10, 2019).

### B.    EOUSA has failed to demonstrate that releasing the withheld information would cause reasonably foreseeable harm.

Having established that the provisions contained in the FIA are applicable to the instant case, to meet its burden, EOUSA must demonstrate that release of the withheld information would reasonably harm an interest protected by the claimed exemptions. The evidentiary standard for demonstrating foreseeable harm is the same that is necessary for proving the propriety of any other withholding under FOIA. The "agency must identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials and connect the harms in a meaningful way to the information withheld." *Judicial Watch v. U.S. Dep't of Commerce*, Case No. 17-cv-1283 (EGS), 10-11 (D.D.C. Nov. 25,

2020) (quoting *Ctr. for Investigative Reporting v. U.S. Customs and Border Prot.,* 436 F. Supp. 3d 90, 105 (D.D.C. 2019)). With regard to the deliberative process privilege specifically, EOUSA "cannot simply rely on 'generalized' assertions that disclosure 'could' chill deliberations." *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020).

EOUSA hasn't addressed the foreseeable harm standard, and as a result, it has failed to meet this burden. However, for the following reasons, Plaintiff contends that it ultimately cannot meet this burden.

**1.      Releasing the withheld records would not harm the interest protected by the attorney-work product privilege.**

This Court previously found that the work-product privilege "protect[s] the integrity of the adversary trial process itself by ensuring attorneys have a zone of privacy within which to think, plan, weigh facts and evidence, candidly evaluate a client's case, and prepare legal theories." See *Bagwell*, p. 14. Thus, the question is whether release of the withheld records would in some way harm the "integrity of the adversary trial process." In this case, at this point in time, it would not.

The investigation to which these records petertain never resulted in charges, nor was there ever a trial. Thus, no "adversary trial process" ever existed and no harm could come from releasing these records. In addition, these records were created roughly 8 years ago, and EOUSA has admitted that "most of the custodians are no longer DOJ employees." (ECF 74, p. 4). Therefore, breaching the theoretical "zone of privacy" years after it was determined this information would no longer be needed for trial would cause no harm.

**2.      Release of the withheld records would not harm the interest protected by the deliberative process privilege.**

This Court previously found that the purpose of the deliberative process privilege is "intended to protect the government decision-making process, primarily by 'assur[ing] that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations.' *Bagwell*, p. 15 (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)). Thus, the question is whether the release of the withheld records, years after the decision-making process had concluded and when most of the participants in the discussion are no longer government employees, would continue to have a chilling effect when providing opinions and recommendations.

When crafting the FIA, Congress limited the temporal reach of the deliberative process privilege to "records created 25 years or more before the date on which the records were requested." 5 U.S.C. § 552(b)(5). It included this limitation to ensure that "government records be made available to the public for their educational and historic value, while providing sufficient time for agencies to protect against the disclosure of their deliberative processes." See Senate Report 114-4. Thus, Congress made it clear that as time goes on, any harm that could result from the disclosure of records protected by the deliberative process privilege is abated. An additional intent of the FIA was to ensure that "information may not be withheld merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears." *Id*.

While 8 years is not 25, the passage of that amount of time is significant. As noted above, prosecutors declined to file charges at the conclusion of this investigation. Most DOJ employees involved in this case are no longer government officials. Releasing these records 8 years after their creation would not chill the internal decision making process. At the least, EOUSA must show how the release of each document would result in foreseeable harm.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully asks this court to **DENY** Defendant's motion for summary judgment and **GRANT** Plaintiff's motion for summary judgment.

Respectfully submitted,

_____

Ryan Bagwell
444 Upham St.
Melrose, MA 01720
(608) 466-6195
ryan@ryanbagwell.com