**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RYAN BAGWELL**, | |
| Plaintiff, | |
| v. | Case No. 15-cv-531 (CRC) |
| **U.S. DEPARTMENT OF JUSTICE**, | |
| Defendant. | |

**MEMORANDUM OPINION**

This long-running Freedom of Information Act ("FOIA") case centers on the efforts of

Ryan Bagwell, a Pennsylvania State University alumnus, to obtain records from the Executive

Office for United States Attorneys ("EOUSA") related to investigations into possible child

sexual abuse on Penn State's campus.  After two previous rounds of briefing, the parties have

filed renewed cross-motions for summary judgment to settle disputes over two remaining sets of

EOUSA's production.  The first—referred to as the "inadvertently overlooked" records—

consists of 11,648 pages of emails that EOUSA belatedly discovered while briefing the last

summary judgment motion.  EOUSA has withheld these records in full.  The second—referred to

as the "remand records"—includes the results of a search of the U.S. Attorney's Office for the

Middle District of Pennsylvania email system, ordered by this Court in 2018, as well as records

EOUSA had referred to the Department of Education and FBI for review.  EOUSA withheld a

portion of these records.  In their cross motions, the parties ask the Court to decide whether

various exemptions to FOIA's disclosure requirement justify EOUSA's withholding decisions.

As explained below, the Court will grant in part and deny in part the government's

motion and deny Bagwell's cross-motion for partial summary judgment.  As to the inadvertently

overlooked records, the Court concludes that none of the cited FOIA exemptions justify

EOUSA's blanket withholding of more than ten thousand pages of documents.  In particular, the Court is not convinced these records are entirely exempt from production solely because they were turned over to federal prosecutors in response to a grand jury subpoena.  As to the remand records, however, the Court is satisfied that the relevant FOIA exemptions support the withholding decisions.

## I.   Background

Assuming familiarity with its two previous summary judgment opinions, see Bagwell v. Dep't of Just., No. 15-cv-531, 2015 WL 9272836 (D.D.C. Dec. 18, 2015) ("Bagwell I"); Bagwell v. Dep't of Just., 311 F. Supp. 3d 223 (D.D.C. 2018) ("Bagwell II"), the Court only briefly outlines the background needed to understand the parties' renewed summary judgment requests.

In April 2014, Plaintiff Ryan Bagwell filed a FOIA request with EOUSA for "any and all records of investigations between November 1, 2011 and [April 30, 2014] that pertain to allegations of child sexual abuse that occurred on the campus of The Pennsylvania State University."  Compl. ¶ 5.  In particular, Bagwell sought information about criminal investigations by the local U.S. Attorney's Office and the Pennsylvania Attorney General's Office into allegations of child sexual abuse by former Penn State assistant football coach Jerry Sandusky.  See Bagwell II, 311 F. Supp. 3d at 227.  He also sought records relating to an internal investigation organized by Penn State's Board of Trustees, led by the law firm of former FBI Director Louis Freeh.  Id.  When EOUSA failed to timely respond to his request, Bagwell, proceeding *pro se*, filed suit against its parent agency, the Department of Justice ("DOJ").  Id.

After the filing of this case, EOUSA made an initial production, releasing 517 pages and withholding 104 more.  Id.  The parties cross-moved for summary judgment.  Id.  But the Court

found summary judgment premature, given concerns about both the sufficiency of the search and the adequacy of the Department's justifications for its withholdings.  See Bagwell I, 2015 WL 9272836, at *2, *4–5.  Following that ruling, DOJ performed a second search of the U.S. Attorney's Office email system, produced an additional set of documents, and made further withholdings.  See Bagwell II, 311 F. Supp. 3d at 227–28.  The parties then prepared renewed motions for summary judgment.  Id. at 228.

But in June 2017, while finalizing its renewed motion, DOJ "realized" it had "inadvertently failed to produce approximately 260,800 pages" of potentially responsive electronic records.  See Mot. for Extension of Time at 2, ECF No. 46.  To avoid further delay, the Court bifurcated the proceedings.  It ordered the parties to propose a separate production and briefing schedule for the "inadvertently overlooked" records and move forward with summary judgment on the material already produced.  See Order of July 19, 2017, at 1–2, ECF No. 50.

Following that briefing, the Court granted in part and denied in part each of the parties' motions.  See Bagwell II, 311 F. Supp. 3d at 228.  As relevant here, the Court first held that the Department's renewed search of the U.S. Attorney's Office email system was still inadequate because at least one chosen search term was not "reasonably calculated to uncover all relevant documents."  Id. at 230 (quoting Ancient Coin Collectors Guild v. Dep't of State, 641 F.3d 504, 514 (D.C. Cir. 2011)).  The Court next addressed a subset of records—known as the "referred records"—that DOJ had referred externally to the Department of Education and internally to the FBI for additional review.  Id. at 230–31.  Because the Department of Education had not yet responded, the Court instructed DOJ "to either produce or explain the withholding of those records."  Id. at 231.  Finally, the Court held that the Department had not adequately supported withholding certain records related to a Pennsylvania state grand jury under Exemption 7(A), but

largely endorsed the withholdings DOJ had made under Exemption 5.  Id. at 233–37.

The pending motions cover the two sets of documents still in dispute following the 2018 summary judgment Order.  First are the "inadvertently overlooked" records.  Given the number of potentially responsive records in this group, Bagwell agreed to narrow the scope of his request to a subset of emails mentioning the names of ten individuals over a fifteen-month period. Hudgins Decl. ¶ 7, ECF No. 109-3; Suppl. Hudgins Decl. ¶ 10, ECF No. 116-1.  These individuals include several former Penn State trustees, as well as attorneys considered or ultimately hired by Penn State to conduct an internal investigation into the Sandusky allegations. See Mike Dawson, Penn State Hired Louis Freeh Over Former Homeland Security Chief Michael Chertoff, Centre Daily Times (Mar. 20, 2014, 1:12 AM), https://www.centredaily.com/ news/local/education/penn-state/jerry-sandusky/article42846120.html.  The resulting search produced 11,648 pages of records, which DOJ withheld in full pursuant to FOIA Exemptions 3, 6, 7(C), and 7(D).  Hudgins Decl. ¶¶ 7–8.

Second are the "remand records."  After meeting and conferring, the parties again agreed to narrow the scope of the request to cover several thousand potentially responsive emails.  Id. ¶ 9.  EOUSA initially released 45 pages in full and 153 in part, and withheld 256 pages.  Id. ¶ 10. EOUSA later provided a response to cover records it had at various points referred to the Department of Education and FBI for review.  Of those records, EOUSA released 1 page in full and 14 in part, and withheld 259 in full.  Id.  For its withholdings, EOUSA cited Exemptions 3, 5, 6, 7(C), and 7(D).[1]  See Hudgins Decl. Ex. A at 7, 9, ECF No. 109-4.

---

[1] EOUSA's letter summarizing its production of the remand records indicated it was also withholding the records pursuant to FOIA Exemption 7(E).  See Hudgins Decl. Ex. A at 7, ECF No. 109-4.  But the Department has not pursued that exemption in litigation.

After these latest rounds of production, the Department again renewed its motion for summary judgment. DOJ asks the Court to hold that it properly invoked Exemptions 3, 5, 6, 7(C), and 7(D), and that no information withheld in its responses could be reasonably segregated. See Def.'s Mem. in Supp. of Renewed Mot. Summ. J. ("Def.'s MSJ") at 6–18, ECF No. 109-1. In his opposition and cross-motion for partial summary judgment, Bagwell challenges the applicability of several cited FOIA exemptions, as well as the sufficiency of the Department's review for material that could be segregated and released. See Pl.'s Mem. in Opp'n to Def.'s Mot. Summ. J. and in Supp. of Pl.'s Cross-Mot. Summ. J. ("Pl.'s MSJ") at 4–17, ECF No. 114.[2] He also contends that his request is governed by the FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538, and that DOJ has not shown, as required by this Act, that release of some withheld material would cause reasonably foreseeable harm. See id. at 18–22; 5 U.S.C. § 552(a)(8)(A)(i)(I). Based on the parties' evidentiary submissions, briefing, and arguments at the January 18, 2022, hearing, the Court will grant in part and deny in part the Department's motion and deny Bagwell's cross-motion.

## II.   Legal Standard

FOIA disputes are typically and appropriately resolved on summary judgment. See Citizens for Resp. & Ethics in Washington v. Dep't of Homeland Sec., 525 F. Supp. 3d 181, 187 (D.D.C. 2021). In FOIA cases, an "agency is entitled to summary judgment if no material facts are genuinely in dispute and the agency demonstrates 'that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information.'" Prop. of

---

[2] Because Bagwell's memorandum contains no page numbers, the Court refers to the PDF page numbers generated by the ECF system.

the People, Inc. v. Off. of Mgmt. & Budget, 330 F. Supp. 3d 373, 380 (D.D.C. 2018) (quoting

Competitive Enter. Inst. v. EPA, 232 F. Supp. 3d 172, 181 (D.D.C. 2017)).

    Although FOIA was enacted "to pierce the veil of administrative secrecy and to open

agency action to the light of public scrutiny," Dep't of the Air Force v. Rose, 425 U.S. 352, 361

(1976), the statute also contains a set of exemptions to the obligation to provide government

records to the public, see 5 U.S.C. § 552(b).  But given FOIA's "strong presumption in favor of

disclosure," its "statutory exemptions, which are exclusive, are to be narrowly construed."  Nat'l

Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002) (internal citation and

quotation marks omitted).  At summary judgment, a government agency withholding responsive

documents bears the burden of proving the applicability of any claimed exemptions.  ACLU v.

Dep't of Def., 628 F.3d 612, 619 (D.C. Cir. 2011).  The government may satisfy this burden

through an affidavit that, among other things, "describes the justifications for withholding the

information with specific detail [and] demonstrates that the information withheld logically falls

within the claimed exemption."  Id.  "Such declarations are entitled to a presumption of good

faith, and the court can award the agency summary judgment based solely on the information so

provided."  Jud. Watch, Inc. v. CIA, 310 F. Supp. 3d 34, 41 (D.D.C. 2018).

### III.   Analysis

    After more than five years of litigation, the parties have narrowed the remaining disputes

to withholdings in two sets of documents—the inadvertently overlooked records, and the remand

records (including the subset of referred records).  The Court takes each group in turn.  As

explained in more detail below, the Court will deny both parties summary judgment as to DOJ's

efforts to withhold all of the inadvertently overlooked records.  The Department has not met its

burden to show that such a blanket exemption is justified under Exemptions 3, 7(D), or 6 and

7(C).  But the Court is satisfied by DOJ's showings as to the remand records, including the referred records.  The Department's briefing, the declarations from EOUSA FOIA officer Natasha Hudgins, and DOJ's <u>Vaughn</u> index demonstrate that the relevant exemptions cover the withheld material, and that DOJ has appropriately released any segregable, non-exempt material.

    A.  <u>The Inadvertently Overlooked Records</u>

The Court first evaluates DOJ's decision to withhold in full the 11,648 pages of emails that make up the inadvertently overlooked records.  In its final <u>Vaughn</u> index, DOJ describes these thousands of pages broadly—in a single entry—as "[t]hird party emails obtained via Grand Jury Subpoena narrowed to search terms of 10 third party individual names."  <u>See</u> <u>Vaughn</u> Index at 4–5, ECF No. 116-2.  The <u>Vaughn</u> index indicates that DOJ withheld the emails pursuant to FOIA Exemption 3, in combination with Federal Rule of Criminal Procedure 6(e); FOIA Exemption 7(D); and FOIA Exemptions (6) and 7(C).  <u>Id.</u>  At least on the current record, DOJ has not shown that any of these exemptions justify its blanket withholding.

    *1.  Exemption 3 and Federal Rule of Criminal Procedure 6(e)*

Exemption 3 allows an agency to withhold material "specifically exempted from disclosure by statute," subject to certain limitations not relevant here.  5 U.S.C. § 552(b)(3).  The D.C. Circuit "recognized long ago that requests for documents related to grand jury investigations implicate FOIA's third exemption, because Rule 6(e) of the Federal Rules of Criminal Procedure prohibits government attorneys and others from 'disclos[ing] a matter occurring before the grand jury.'"  <u>Lopez v. Dep't of Just.</u>, 393 F.3d 1345, 1349 (D.C. Cir. 2005) (alteration in original) (quoting Fed. R. Crim P. 6(e)(2)(B)).  This Rule protecting grand jury secrecy exists, among other reasons, to protect jurors and preserve free deliberation, prevent witness tampering or intimidation, encourage full cooperation by future grand jury witnesses,

and safeguard the innocent reputation of those investigated but not indicted.  See 1 Charles Alan

Wright & Arthur R. Miller, Federal Practice and Criminal Procedure § 106 (4th ed. Apr. 2021).

DOJ argues that Exemption 3, in conjunction with Rule 6(e), permits withholding of the

entirety of the inadvertently overlooked records because releasing "emails obtained by grand jury

subpoena from Pennsylvania State University is likely to pierce the veil of secrecy over the

direction of the grand jury investigation."  Def.'s MSJ at 8.  Bagwell disagrees.  In his view, the

government has not "prove[n] that the documents themselves would reveal some protected

aspect of the grand jury process," as required at summary judgment to invoke this exemption.

See Pl.'s MSJ at 6.  Bagwell has the better of this argument.

As the D.C. Circuit has repeatedly noted, Rule 6(e) does not "draw[] 'a veil of secrecy

. . . over all matters occurring in the world that happen to be investigated by a grand jury.'"

Lopez, 393 F.3d at 1349 (quoting SEC v. Dresser Indus., Inc., 628 F.2d 1368, 1382 (D.C. Cir.

1980)).  The Rule does not prohibit the "disclosure of information coincidentally before the

grand jury [which can] be revealed in such a manner that its revelation would not elucidate the

inner workings of the grand jury."  Senate of the Commonwealth of Puerto Rico v. Dep't of

Just., 823 F.2d 574, 582 (D.C. Cir. 1987) (alteration in original) (internal quotation marks

omitted)).  Instead, "[t]he relevant inquiry for this Court is whether disclosure of the information

requested would 'tend to reveal some secret aspect of the grand jury's investigation, such matters

as the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the

investigation, the deliberations or questions of jurors, and the like.'"  Lopez, 393 F.3d at 1349

(quoting Senate of Puerto Rico, 823 F.2d at 582).

DOJ claims, in effect, that revealing almost *any* material obtained via a grand jury

subpoena would tend to improperly reveal the scope and direction of the grand jury's

investigation, see Def.'s MSJ at 8–9, but binding D.C. Circuit case law precludes the Court from applying such a broad rule.  Labow v. Department of Justice—a case the Department fails to grapple with or even cite—squarely addresses the issue.  831 F.3d 523 (D.C. Cir. 2016).  There, the D.C. Circuit evaluated DOJ's decision to withhold "copies of specific records provided to a federal grand jury in response to federal grand jury subpoenas" on the ground that they "could reveal the inner workings of a federal grand jury."  Id. at 529.  The court rejected this blunt approach, reasoning that "[t]he mere fact the documents were subpoenaed" would "not necessarily reveal a connection to a grand jury."  Id. at 529–30.

That analysis applies to DOJ's blanket withholding attempt here.  As in Labow, Bagwell "did not request documents related to a grand jury; he sought documents about particular people" and "[t]he *government* revealed the existence of a grand jury" through its withholding decision. Id.  As another court in this district has observed, where "testimony or data is sought for its own sake for its intrinsic value," rather than "to learn what took place before the grand jury," many of the traditional considerations supporting Rule 6(e) "are unlikely to be present."  Boehm v. FBI, 983 F. Supp. 2d 154, 159 (D.D.C. 2013) (internal quotation marks omitted).

And on the current record—with all 11,000-plus pages described in a single Vaughn index entry—it is impossible to tell whether any concerns about grand jury secrecy are in fact implicated by the documents here.  DOJ says only that the revelation of emails containing certain names during certain timeframes could shed light on the "timeline that is of interest to the grand jury," as well as the "individuals who could have been called as witnesses to the grand jury." Suppl. Hudgins Decl. ¶¶ 24–25.  But the D.C. Circuit has rejected a "*per se* rule against disclosure of any and all information which has reached the grand jury chambers, let alone any and all information which could reach the grand jury."  Citizens for Resp. & Ethics in

Washington v. Dep't of Just., 746 F.3d 1082, 1100 (D.C. Cir. 2014) (internal citation omitted);

see also Comm. on Judiciary, U.S. House of Reps., 332 F.R.D. 412, 416 (D.D.C. 2019)

(reasoning that an "individual's past status as a potential witness sheds no light on the direction

the grand jury took").  And significantly, DOJ never avers that *all* 11,000 pages contain such

potentially sensitive information, nor that Bagwell would be able to reconstruct anything specific

about the target or direction of the investigation from such a large data set.  While the

Department may take a categorical approach with its disclosures, Lopez, 393 F.3d at 1349, those

categories must be specific enough to permit a meaningful inquiry using the standards the D.C.

Circuit has provided.  On this record, the Department's rationale is simply too "conclusory" for

the Court to do so.  Citizens for Resp. & Ethics in Washington, 746 F.3d at 1100.

The Court will therefore deny both sides summary judgment without prejudice on this

issue and will return the matter to DOJ for further review in light of Labow.  On remand, DOJ

must consider whether the documents at issue would have "necessarily evince[d] their

connection to a grand jury," in a way that "could not be dealt with through redactions," had they

been released before DOJ invoked Rule 6(e).  Labow, 831 F.3d at 530.

While few courts have addressed how the government can meet this standard in the wake

of Labow,[3] the Court has gleaned several broad guiding principles.  Most basically, the material

---

[3] Indeed, in several instances where courts have asked the government to reevaluate its
withholdings, the government chose to release the documents at issue, despite previous claims
that doing so would intrude on grand jury secrecy.  See, e.g., Notice of Release, Shapiro v. Dep't
of Just., No. 12-cv-313 (Aug. 26, 2020), ECF No. 133 (noting release of documents in wake of
district court's denial of summary judgment in 2020 WL 3615511, at *42 (D.D.C. July 2, 2020));
Notice Regarding FBI's Processing, Bartko v. U.S. Dep't of Just., No. 13-cv-1135 (Aug. 15,
2019), ECF No. 286 (agreeing to process documents after D.C. Circuit remanded for
reevaluation of Exemption 3 withholding under Labow and district court invited renewed
briefing on issue).

must be—without the government saying so—"identifiable as materials sought by the grand jury." Bartko v. U.S. Dep't of Just., 898 F.3d 51, 73 (D.C. Cir. 2018).  Material might on its face evince a connection to the grand jury—through substantive references to the grand jury, or through a grand jury "heading or exhibit stamp" that cannot be effectively redacted.  See Labow v. U.S. Dep.'t of Just., 278 F. Supp. 3d 431, 445 (D.D.C. 2017).  In addition, in the Court's view, if a requester has independent knowledge of the existence of a grand jury—through public reporting or personal experience as a witness or target—a prosecutor's possession of certain documents could confirm, or at least suggest, that they were obtained via grand jury investigation.  And if the material is so identifiable, the Department still must demonstrate that disclosure would "tend to reveal some secret aspect of the grand jury's investigation, including" its "strategy or direction." Bartko, 898 F.3d at 73.  In some instances, copies of specific records produced pursuant to a subpoena may fit this bill—for example, if they disclose the recipient of the subpoena, identify specific subjects of investigation, or reveal new information about the scope of the grand jury's attention.  See Prop. of the People, Inc. v. Dep't of Just., 539 F. Supp. 3d 16, 24 (D.D.C. 2021) (approving withholding of six documents for similar reasons).  A group of documents could likewise qualify, if, when taken together, there are signs of culling or organization that would tend to reveal where the grand jury set its focus.  These principles may very well apply to some large portion of the subpoena returns at issue here.  After all, records subpoenaed by a grand jury can naturally be expected to concern the subject matter and focus of its investigation.  Why else would the grand jury ask for them?

All this highlights a degree of real-world tension between the Circuit's holding in Labow—that documents obtained via grand jury subpoena do not automatically fall within Exemption 3—and Rule 6(e)'s prohibition against disclosing records that would reveal matters

occurring before the grand jury.  In some sense, disclosing *any* record subpoenaed by a grand jury *could* shed at least some light on the matters the grand jury was examining.  Of particular concern is the possibility that, if a FOIA requester knows or has reason to suspect that a grand jury existed, the request could be employed to confirm that fact and learn what subject matters and evidence the grand jury examined.

The facts of <u>Labow</u> underscore this point.  There, the government had investigated and prosecuted suspected "anarchist extremist[s]" who vandalized property during protests of the World Bank and International Monetary Fund.  831 F.3d at 526.  When discovery in a related civil case revealed that the FBI considered Mr. Labow an extremist as well, he lodged a FOIA request with the FBI for records about him.  <u>Id.</u>  Knowing the FBI considered him an extremist and that criminal prosecutions had resulted from the World Bank protests, Labow might have reasonably inferred that a grand jury had investigated persons connected to the protests, perhaps including him—even without the government saying so.  And receiving the subpoena return, even if not marked as such, could well have confirmed that fact and revealed what evidence, if any, the grand jury had assembled to connect Labow to criminal activity.  That information strikes the Court as falling within Rule 6(e)'s definition of "matters occurring before the grand jury," yet the Circuit nonetheless rejected the government's invocation of Exemption 3.  <u>Id.</u> at 530.

Perhaps the Circuit accepted this tension, given the other tools FOIA gives the government to protect ongoing criminal investigations and other sensitive law enforcement prerogatives.  <u>See</u> 5 U.S.C. § 552(b)(7).  Or perhaps the Circuit's ruling should be read more narrowly to avoid this tension, by focusing solely only on the government's inadequate explanation there.  Under such a reading, <u>Labow</u> could still permit invocation of Exemption 3 in

cases, including potentially this one, where circumstances surrounding the request—like the identity of the requester and the publicity surrounding the investigation—suggest that disclosure would confirm the existence of a grand jury investigation and reveal the evidence it developed.

These concerns must be left for another day, because (as in Labow) the government has provided scant explanation as to why these documents would reveal anything about the grand jury, its investigation, or deliberations. The Court is particularly mindful of the size of the subpoena return here—totaling more than 11,000 pages. That large a set may include many documents only "coincidentally" before the grand jury, see Senate of Puerto Rico, 823 F.2d at 582, and may not reveal much about the investigation when viewed together. If the Department, after full review, continues to believe that disclosing some or all of these documents risks intrusion into the protected sphere of the grand jury, it may submit a more detailed declaration and Vaughn index, along with any applicable caselaw, explaining why that is so. The Court can review the government's declaration *in camera* if detailing the specific disclosure risks would undermine the purpose of the exemption.

        2. *Exemption 7(D)*

DOJ next argues that its withholding of the inadvertently overlooked records was proper under Exemption 7(D), which protects, in relevant part, "information furnished by a confidential source" when "compiled by criminal law enforcement authority in the course of a criminal investigation." 5 U.S.C. § 552(b)(7)(D). See Def.'s MSJ at 16–17; Def.'s Reply & Opp'n at 16–19. The parties largely disagree about whether Penn State University—the source of the material in the inadvertently overlooked records—qualifies as a "confidential source," as required for application of this exemption, see Citizens for Resp. & Ethics in Washington, 746 F.3d at 1101. See Pl.'s MSJ at 7–9; Def.'s Reply & Opp'n at 17–18. The Court concludes DOJ has not shown

that the University was a confidential source, so it likewise cannot justify a blanket withholding under Exemption 7(D).

Although Exemption 7(D) allows, in relevant part, an agency to withhold information furnished by a confidential source, see 5 U.S.C. § 552(b)(7)(D), "the question is not whether the requested *document* is of the type that the agency usually treats as confidential, but whether the particular *source* spoke with an understanding that the communication would remain confidential," Dep't of Just. v. Landano, 508 U.S. 165, 172 (1993).  The applicability of this exemption therefore "depends upon whether the particular source who furnished the information at issue was granted confidentiality, either expressly or by implication."  Mays v. Drug Enf't Admin., 234 F.3d 1324, 1328 (D.C. Cir. 2000).

DOJ has not shown that Penn State was granted confidentiality, either expressly or by implication.  As an initial matter, the Department does not argue that the University was ever expressly offered confidentiality.  But it does contend that a guarantee of confidentiality can be inferred because Penn State furnished these records to "federal investigators solely under the presumed confidentiality of the grand jury investigation."  Def.'s MSJ at 16.  In support, DOJ points first to general statements in its declaration that, "[g]iven the nature of how the records were obtained by DOJ, and the seriousness of the crimes at issue, Penn State could reasonably infer a level of confidentiality unless the government decided to pursue criminal or civil enforcement against individuals or the university."  Suppl. Hudgins Decl. ¶ 36.  In DOJ's view, essentially any recipient of a subpoena issued by a grand jury investigating a serious or sensitive crime, when submitting evidence pursuant to a subpoena, could infer that a confidentiality agreement exists.  But DOJ has pointed to no case to support such a broad approach to confidentiality, nor could the Court find one.  And that is likely for good reason; DOJ's rule

would eviscerate the well-established, carefully drawn limits on the invocation of grand jury secrecy under Exemption 3 catalogued above.

The Court is not convinced by any of the more case-specific reasons DOJ offers for inferring a guarantee of confidentiality here.  It looks first to Penn State's locus "at the center of" an investigation into child sexual abuse, a "serious" criminal charge.  Suppl. Hudgins Decl. ¶¶ 37–38.  To be sure, the Supreme Court has indicated that "the nature of the crime that was investigated and the source's relation to it" are relevant to whether an inference of confidentiality exists.  Landano, 508 U.S. at 180; see also Roth v. Dep't of Just., 642 F.3d 1161, 1184 (D.C. Cir. 2011) (listing other factors).  But Penn State is a large and well-represented public institution—a far cry from the "witness[] to a gang-related murder" the Supreme Court offered as an example of someone who might be "unwilling to speak . . . except on the condition of confidentiality." Landano, 508 U.S. at 179.  The circumstances here thus do not support a finding of some implicit confidentiality agreement.  The only other suggestion of confidentiality advanced by the Department is a statement from the EOUSA FOIA officer that, after the filing of this case, she spoke with an Associate General Counsel at Penn State, who "expressed his belief that records turned over via grand jury subpoena would remain confidential, absent a federal criminal prosecution."  Hudgins Decl. ¶ 21.  This general, post-hoc, hearsay rationale is unavailing.  Even taken at face value, Penn State's *belief* that a confidentiality agreement existed—without knowing the foundation for that belief—is not enough.  DOJ must show that circumstances at the time gave rise to an "implied *assurance* of confidentiality."  Landano, 508 U.S. at 179 (emphasis added).  As the Court has already explained, the circumstances here did not.  For this reason, the Department has again not justified its broad withholding effort, this time under Exemption 7(D).

### 3. *Exemptions 6 and 7(C)*

The Department's <u>Vaughn</u> index lists Exemptions 6 and 7(C) as the final justifications

for withholding the inadvertently overlooked records.  These exemptions, which are often tied

together, allow for withholding of material to protect personal privacy.  <u>See</u> 5 U.S.C. § 552(b)(6)

(authorizing withholding of personnel and other files if disclosure "would constitute a clearly

unwarranted invasion of personal privacy"); <u>id.</u> § 552(b)(7)(C) (authorizing withholding of law-

enforcement records if release "could reasonably be expected to constitute an unwarranted

invasion of personal privacy").  But DOJ never claims that these two exemptions could justify

the complete withholding of all 11,648 pages of inadvertently overlooked records.  <u>See</u> Def.'s

MSJ at 15 ("EOUSA withheld certain information of the inadvertently overlooked . . . records

pursuant to FOIA Exemptions 6 and 7(C)."); Suppl. Hudgins Decl. ¶ 14 (explaining only that

certain redactions were necessary to protect personal privacy).  As a result, the Court need not—

indeed cannot—decide now whether any specific redactions would be proper under these

exemptions.

Because the Department has not justified its decision to withhold the entirety of the

inadvertently overlooked records, the Court will deny the Department's motion for summary

judgment on this category of documents without prejudice.  Instead, the Court will order the

Department to conduct a further review to determine which records or portions thereof can be

properly withheld under the cited exemptions, following the guidance laid out in this Opinion.

### B.  The Remand Records

The Court reaches a different conclusion with respect to the remaining disclosure and

withholding decisions—covering records remanded by the Court's 2018 summary judgment

Order, including a subset referred to the Department of Education and FBI.  DOJ has since

released a number of these documents, but it withheld some in full and others in part under

various FOIA exemptions.[4]  See Hudgins Decl. ¶¶ 9–10, 27, 34.  As to these records, DOJ made

far more targeted withholding determinations and offered the Court far more detail to evaluate

their propriety.  As a result, and as explained in more detail below, the Court concludes that DOJ

has met its burden at summary judgment as to these remaining records.

       1.  *Exemption 5*

The agency cited FOIA's fifth exemption as a justification for withholding many of the

remand records in full or in part.  See Suppl. Hudgins Decl. ¶ 41; see, e.g., Vaughn Index at 1–3

(withholding in part portions of referred records); id. at 5–61 (withholding in full many of the

initial remand records).  "Exemption 5 incorporates the privileges available to Government

agencies in civil litigation, such as the deliberative process privilege, attorney-client privilege,

and attorney work-product privilege."  U.S. Fish & Wildlife Serv. v. Sierra Club, Inc., 141 S. Ct.

777, 783 (2021).  For each relevant withholding, DOJ has asserted the attorney work-product

privilege, and in almost all cases the deliberative-process privilege as well.  As explained below,

the Court is satisfied that DOJ properly invoked at least the first privilege.

---

   [4]  As to this second set of records, Bagwell does not seem to challenge the DOJ's
withholdings under Exemptions 6 and 7(C) to protect personal privacy.  In this section of his
briefing, Bagwell only mentions the Department's reliance on these exemptions in passing, when
claiming that DOJ's withholding of the referred records did not have "evidentiary support."  Pl.'s
MSJ at 17.  Reviewing the discussion of the referred records in DOJ's revised Vaughn index and
declarations, the Court is satisfied that the agency's withholding and segregability decisions as to
Exemptions 6 and 7(C) are supported.  See Vaughn Index at 1–4 (breaking out rationale for
partial withholding of referred records); Hudgins Decl. ¶¶ 26–30 (explaining application of
privacy exemptions).  Because Bagwell does not otherwise challenge the application of
Exemptions 6 and 7(C) to the rest of the remand records, the Court does not consider any broader
objection here.  See Anglers Conservation Network v. Pritzker, 139 F. Supp. 3d 102, 116 n.10
(D.D.C. 2015) ("[A]n argument not raised in an opening brief is forfeited."); Al-Tamimi v.
Adelson, 916 F.3d 1, 6 (D.C. Cir. 2019) (same).

The court begins with the Department's assertion of the work-product privilege, as that is where Bagwell centers his challenge.  The attorney work-product privilege aims "to protect the integrity of the adversary trial process," by providing lawyers "a zone of privacy within which to think, plan, weigh facts and evidence, candidly evaluate a client's case, and prepare legal theories."  Nat'l Ass'n of Crim. Def. Laws. v. Dep't of Just. Exec. Off. for U.S. Att'ys, 844 F.3d 246, 251 (D.C. Cir. 2016) (internal citation and quotation marks omitted).  While "Congress had the attorney's work-product privilege specifically in mind when it adopted Exemption 5, . . . [n]ot every document created by a government lawyer . . . qualifies for the privilege (and thus, the exemption)."  Id. (internal citation and quotation marks omitted).  Instead, the D.C. Circuit has "long required a case-specific determination that a particular document in fact was prepared in anticipation of litigation before applying the privilege to government records."  Id.  "In ascertaining whether a document was prepared in anticipation of litigation," the Circuit has instructed courts to apply a "because of test, asking whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation."  Id. (internal quotation marks omitted).  Under that standard, the attorney who created the document must have had "a subjective belief that litigation was a real possibility," and that belief must have been "objectively reasonable."  Id.

Bagwell does not specifically challenge any of the withholding decisions laid out in the Vaughn index, but asserts generally that the Department has not adequately demonstrated that litigation was a real possibility at the time these emails were sent.  See Pl.'s MSJ at 11–15.  The Court already rejected that argument in the last round of summary judgment, with respect to

similar documents produced earlier in this litigation.  See Bagwell II, 311 F. Supp. 3d at 234–35.
The Court sees no reason to reconsider this conclusion, as Bagwell now asks it to do.

Bagwell first contends that the Court's settled conclusion runs afoul of the D.C. Circuit's
opinion in Safecard Services Inc. v. SEC, 926 F.2d 1197 (D.C. Cir. 1991).  See Pl.'s MSJ at 11–
12.  There, as Bagwell recognizes, the D.C. Circuit held that, "where an attorney prepares a
document in the course of an active investigation focusing upon specific events and a specific
possible violation by a specific party, it has litigation sufficiently 'in mind' for that document to
qualify as attorney work product."  Safecard, 926 F.2d at 1203.  Bagwell focuses on the Safecard
court's warning "that the work product exemption, read over-broadly, could preclude almost all
disclosure from an agency with substantial responsibilities for law enforcement."  Id.  He
suggests that approving the withholdings here would require such an overbroad reading.

But, as it was in 2018, the Court is convinced that the emails at issue were prepared as
part of an active investigation into specific misconduct, and thus fall squarely under the general
Safecard rule outlined above.  The declarations of agency FOIA officer Natasha Hudgins
indicate that the withheld documents include internal emails weighing the decision to subpoena
certain documents, Hudgins Decl. ¶ 34; communications with other federal agencies about
"potential investigation strategy," id. ¶ 35; and discussions of "witness interviews, . . . potential
grand jury witnesses, . . . [and] victim interviews and their impact on the unfolding
investigation," Suppl. Hudgins Decl. ¶ 43.  A survey of the Vaughn index offers further
reassurance.  According to that index, the documents withheld under the work-product privilege
would have revealed, among other things, discussions about "potential criminal and civil Cleary
Act enforcement," Vaughn Index at 1; the decision to call a specific grand jury witness, id. at 10;
and "discussions, mental impressions, and legal analysis" regarding certain victim interviews, id.

at 32.  These are the kind of quintessential pre-litigation discussions the work-product doctrine is meant to protect.

To refute this conclusion, Bagwell avers generally that prosecutors in the U.S. Attorney's Office did not actually believe any charges were likely, and were instead engaging in "a classic fishing expedition."  Pl.'s MSJ at 14–15.  But DOJ has declared that these emails contained investigation and litigation strategy related to specific individuals, Hudgins Decl. ¶ 35, and that representation is entitled to a presumption of good faith, Jud. Watch, Inc., 310 F. Supp. 3d at 41. The Court is not convinced by the sole rebuttal evidence Bagwell offers:  an unlabeled document containing, he says, notes an investigator at the firm Penn State hired to conduct an internal investigation took during a February 2012 meeting with federal prosecutors.  See Pl.'s MSJ at 14–15.  In those notes, the investigator opined that the government's case "seem[ed] to come from newspaper reports"—not any witnesses—and that they "[a]ppear[ed] to be fishing."  See Pl.'s MSJ Ex. E at 16–17, ECF No. 114-5.  Even if the Court were to credit this material, it only suggests that one individual—not inside the prosecutor's office—thought that the investigation seemed to be in early stages.  That is not enough to demonstrate that the U.S. Attorney's Office was not actively contemplating litigation.

Having disposed of Bagwell's only general objection to applying Exemption 5, the Court turns to his concern that the Department did not adequately segregate and release any material not protected by the work-product or deliberative-process privileges.[5]  See Pl.'s MSJ at 15–17. "It is undisputed that under FOIA non-exempt information that is 'reasonably segregable' from

---

[5]  Although the point heading on the deliberative-process privilege in Bagwell's opening memorandum claims DOJ "failed to prove" its applicability, he offers no argument on this point. See Pl.'s MSJ at 16–17.  Because Bagwell only asks the Court to review the agency's segregability obligations, the Court limits its discussion to that issue.

exempt information must be disclosed." Elec. Frontier Found. v. Dep't of Just., 739 F.3d 1, 12 (D.C. Cir. 2014) (quoting 5 U.S.C. § 552(b)).  The government bears the "burden of demonstrating that no reasonably segregable information exists within . . . documents withheld." Loving v. Dep't of Def., 550 F.3d 32, 41 (D.C. Cir. 2008).  But "the description of the document set forth in the Vaughn index and the agency's declaration that it released all segregable material" may be "sufficient to fulfill the agency's obligation to show with reasonable specificity why a document cannot be further segregated."  Id. (internal citation and quotation marks omitted).  The Department is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material."  Hodge v. FBI, 703 F.3d 575, 582 (D.C. Cir. 2013) (alteration in original).

Here, the Department has met its burden to demonstrate that it adequately searched for and released segregable material, and Bagwell has not put forward any evidence to rebut that conclusion.  In her declaration, EOUSA's FOIA officer attested to a line-by-line review of the material, and she explained that the agency had segregated and released certain "non-exempt information" where possible.  Hudgins Decl. ¶ 44–45.  The detailed Vaughn index supports this representation.  In several cases, DOJ redacted material covered by Exemption 5 but otherwise released the remainder of the record.  To take one example, DOJ released a portion of an email exchange discussing a blog post and withheld only, as relevant here, the "mental impressions and legal analysis of prosecutors" contained in the exchange.  Vaughn Index at 68.  And for the material withheld in full, detailed descriptions in the Vaughn index indicate the privileged nature of the entire document.  See, e.g., id. at 15–16 (noting email focused on "potential waiver of privilege from" Penn State); id. at 16–17 (describing internal email about whether to "work with state prosecutors in interviewing specific witnesses").  Bagwell offers no evidence to suggest that

DOJ shirked its obligation to search for and release segregable material, so the Court is satisfied it did so.[6]

### 2.   *Exemption 3 and Federal Rule of Criminal Procedure 6(e)*

For two of the remand records, the Department justified its withholding decision in part under FOIA Exemption 3 and Federal Rule of Criminal Procedure 6(e), again invoking the need to protect grand jury secrecy.  See Vaughn Index at 51–52 (withholding U.S. attorney email "pertaining to grand jury disclosure"); id. at 80–81 (withholding in part discussion of scheduling law firm client as grand jury witness).  As to this first document, the Court has already upheld its withholding in full under Exemption 5.  That email's discussion of grand jury disclosures qualifies for the deliberative-process and work-product privileges.  See Part III.B.1, supra.  As to the second, the Court is convinced that application of Exemption 3 is this time justified.  According to the Vaughn index, this email identifies a potential grand jury witness as such.  Because that is precisely the kind of "secret aspect of the grand jury's investigation" contemplated by Rule 6(e), Lopez, 393 F.3d at 1349, the Court affirms the use of that exemption here.

### 3.   *FOIA Improvement Act*

Finally, the Court considers the FOIA Improvement Act of 2016 ("FIA"), which imposes an obligation on agencies to show that release of material would result in reasonably foreseeable harm.  5 U.S.C. § 552(a)(8)(A)(i)(I).  Bagwell spends a significant portion of his briefing arguing

---

[6] Bagwell also contends that the Department's Vaughn index is not sufficiently specific because it lists entire email chains in single entries, rather than breaking out the rationale for "each withheld page."  Pl.'s MSJ at 17.  Given the nature of the withholding determinations in this case, the Court finds the Vaughn index detailed enough to support the Department's segregability analysis, without any page-by-page detail.

that DOJ has run afoul of the FIA.  See Pl.'s MSJ at 18–22.  The Court need not reach the

substance of this argument because Bagwell is incorrect about whether the statute applies here.

Signed into law on June 30, 2016, the FIA includes an "applicability" section declaring

that it "shall take effect on the date of enactment . . . and shall apply to any request for records

. . . *made after the date of enactment*."  FOIA Improvement Act of 2016, Pub. L. No. 114-185,

§ 6, 130 Stat. 538, 544–45 (emphasis added).  Bagwell made his request in April 2014—two

years before that stated effective date.  He nevertheless urges the Court to find the FIA applies

retroactively, pointing out that the statute does not say it *only* applies to requests made after the

enactment date.  See Pl.'s MSJ at 18–20.  He also points to several cases where courts have

considered FIA arguments with respect to requests made before June 2016.  See, e.g., Sorin v.

Dep't of Just., 758 F. App'x 28, 33 (2d Cir. 2018) (discussing but rejecting FIA objection for

pre-2016 FOIA request); Long v. CIA, No. 15-cv-1734, 2019 WL 4277362, at *4–5 (D.D.C.

Sept. 10, 2019) (denying agency summary judgment based on a different provision in the FIA as

to 2015 FOIA request).  Crucially, however, Bagwell offers no case affirmatively holding that

the FIA applies retroactively, and the Court has found none.  Rather, the Court located several

cases—including binding D.C. Circuit precedent—expressly declining to apply the FIA's

foreseeable harm standard because the relevant requests were made before June 2016.  See, e.g.,

Reps. Comm. for Freedom of the Press v. FBI, 3 F.4th 350, 357–58 (D.C. Cir. 2021) ("This rule

applies only to requests for records under FOIA made after June 30, 2016."); Hall v. CIA, 268 F.

Supp. 3d 148, 157 n.3 (D.D.C. 2017) (declining to apply FIA to requests made before statute's

effective date); Edelman v. SEC, 239 F. Supp. 3d 45, 54 n.5 (D.D.C. 2017) (same).  Given the

plain terms of the statutory language and the uniform conclusion of decisions directly addressing

the retroactivity question, the Court will not apply the FIA to this April 2014 FOIA request.

**IV.   Conclusion**

For the foregoing reasons, the Court will grant in part and deny in part the Department of Justice's motion for summary judgment and deny Bagwell's cross-motion for partial summary judgment.  It will deny without prejudice both motions with respect to the Department's withholding of the inadvertently overlooked records.  As to these records, the Department must conduct further review, release any material not covered by an applicable exemption, and provide specific justification for any withholdings, consistent with the guidance laid out in this Memorandum Opinion.  With respect to the Department's withholdings among the remand records, the Court will grant the Department summary judgment.

A separate Order shall accompany this Memorandum Opinion.


                                                                _____

                                                                CHRISTOPHER R. COOPER
                                                                United States District Judge

Date:  <u>March 1, 2022</u>